**SOUTHERN ALAMEDA SPANISH SPEAKING ORGANIZATION** (also known as Sasso) et al., Plaintiffs,

v.

**CITY OF UNION CITY et al.,**
Defendants.

No. 51590.

United States District Court,
N. D. California.

July 31, 1970.

Cruz Reynoso, San Francisco, Cal., Richard F. Bellman, New York City, D'Army Bailey, San Francisco, Cal., for plaintiffs.

John Trump, of Bell, Trump, Sheppard & Raymond, Fremont, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This action is brought by the Southern Alameda Spanish Speaking Organization (SASSO)—a non-profit corporation, and certain individual plaintiffs, low income Mexican-American residents of Union City, Alameda County, against the City and its officials, to compel the defendants to take all steps necessary, including multi-family dwelling rezoning of certain Baker Road property to enable plaintiffs to build a housing project in the Baker Road section of the City.

In January, 1969, SASSO obtained an option to purchase the Baker Road property with the intention of constructing thereon a 280 unit, federally funded, low and moderate income housing project.

Since 1962 the property had been planned for small family residential use with a holding classification of agricultural until so zoned but, at the request of SASSO, the City Council on April 7, 1969, adopted a rezoning ordinance providing for a variance permitting multi-family residential use.

This ordinance, however, never went into effect because community opponents of the proposed rezoning, invoking California Elections Code Sections 4051, 4052, commenced and perfected referendum proceedings.

After an unsuccessful attempt by plaintiffs to have this court enjoin the holding of the referendum election, the city-wide referendum election was held on July 29, 1969. The voters rejected and overrode the City Council's rezoning ordinance by a vote of 1149 to 845.

Since the rezoning never became effective, the proposed Baker Road site remained as previously zoned with the result that SASSO could not proceed with its project.

In November, 1969, after the referendum, plaintiffs, contending at that time that the referendum election had been racially motivated, again applied to this court for a preliminary injunction requiring the City to take all steps necessary to enable plaintiffs to proceed with their multi-family use housing project on the Baker Road site notwithstanding the referendum rejection by the electorate of the City Council's multi-family use rezoning ordinance.

On January 14, 1970, this court filed its Memorandum of Decision, 314 F. Supp. 967, setting forth the grounds upon which it refused to issue a preliminary injunction enjoining the City to that effect.

THE LEGAL ISSUE

On March 16, 1970, this ruling was affirmed by the Court of Appeals in an opinion 9 Cir., 424 F.2d 291, pointing out among other things that:

"Neither the zoning process itself nor the result can be said to be such an arbitrary or unreasonable exercise of the zoning power as to be violative of appellants' right to due process of law," and, further, "we do not believe that the question of motivation [1] for the referendum (apart from consideration of its effect) is an appropriate one for judicial inquiry."

In the course of its opinion, however, the court said:

"Appellants' equal protection contentions, however, reach beyond purpose. They assert that the effect of the referendum is to deny decent housing and an integrated environment to low

---

[1]. At the previous hearings in this case, held on July 3, 1969 and in November, 1969, plaintiffs, seeking at that time to invalidate the referendum election, contended that the real reason for invoking referendum proceedings was a racially motivated attempt on the part of the Anglo-American element of the population to exclude Mexican-Americans from the Baker Road vicinity.

The record then, as now, shows however, that the electorate of Union City has thus far elected a city government in which the City Council consists of two councilmen of Mexican-American descent, one of Portugese descent, one of Spanish descent and one of Japanese descent—but no Anglo-American; the City Planning Commission consists of other members of Porto Rican descent and only two of Anglo-American descent; the Park and Recreation Commission consists of two members of Mexican-American descent, one of Portugese descent and only one of Anglo-American descent.

The record shows further that even in Westview Estates, from which opposition to the Baker Road rezoning came, the racial composition, although predominantly Anglo-American, has a significant 25% of Mexican-Americans along with 25% other minorities and 50% Anglo-American. The vote on the referendum, even in the predominantly Mexican-American Decoto and Alvarado precincts, was more or less evenly divided on the rezoning issue.

income residents of Union City. If, apart from voter motive, the result of this zoning by referendum is discriminatory in this fashion, in our view a substantial constitutional question is presented. Surely, if the environmental benefits of land use planning are to be enjoyed by a city and the quality of life of its residents is accordingly to be improved, the poor cannot be excluded from enjoyment of the benefits. Given the recognized importance of equal opportunities in housing, it may well be, as matter of law, that it is the responsibility of a city and its planning officials to see that the city's plan as initiated or as it develops accommodates the needs of its low income families, who usually—if not always—are members of minority groups. It may be, as a matter of fact, that Union City's plan, as it has emerged from the referendum, fails in this respect. These issues remain to be resolved."

On May 27, 1970, upon plaintiffs' request for trial of these issues, this court made its pre-trial order setting the trial for June 2, 1970.

We regard the last quoted portion of the Court of Appeals' opinion as stating "the law of the case" for the purpose of these trial proceedings.

## THE FACTUAL ISSUE

The issue, therefore, now before the court is not the legality of the July 29, 1969 referendum (an issue which has now been settled both by this court and the Court of Appeals) but whether, as stated by the Court of Appeals, the effect of the referendum, apart from motivation, is to deny decent housing and an integrated environment to low income residents of Union City, i. e., does the City's plan, as initiated or as it has emerged from the referendum, accommodate the needs of low income families who are usually members of minority groups.

These issues have been thoroughly tried over a period of 14 court days, 17 witnesses, and 50 items of documentary evidence.

Plaintiffs have attempted to establish that as a result of the referendum election, annulling the City Council's rezoning of the Baker Road site, SASSO and low income Mexican-American residents of Union City are now in effect, prevented by the City's zoning practices from building any low cost housing project in Union City.

The City and its officials deny that the referendum rejection of the Baker Road rezoning has had any such effect, contending that the City has in all respects accommodated to the needs of its low income residents; that its zoning practices do reasonably accommodate the housing needs of low income residents, such as SASSO claims to represent, and further, that, while SASSO insists on a claimed right to have one particular site, the Baker Road site, rezoned to its liking, there are plenty of other vacant sites which are suitable so far as zoning practices are concerned, and available for low cost housing projects—some of these sites already zoned for multi-family use and others which could be rezoned for such use.

## THE FACTUAL BACKGROUND

In 1959 an East Bay area of about 14.4 square miles, 9,216 acres, lying between the cities of Fremont and Hayward and including the two old Mexican-American communities of Decoto and Alvarado, was incorporated as Union City. The population of the new city was then 6,650—about 55% Mexican-Americans.

The City adopted its first Master Plan in 1962, projecting about 43 of its total 9,216 acres for multi-family use. By 1964, when its population had risen to 8,500, the City adopted its first zoning ordinance under which, together with rezonings to date, its 9,216 acres are currently zoned as follows: Miscellaneous uses (e. g., streets, roads and other public uses) 2,700 acres; industrial use, 1,640 acres; commercial use, 225 acres; agricultural use, 2800 acres; single fam-

ily residential, 1500 acres; multi-family residential, 360 acres.

By 1969 the population had grown to 11,000 and it has risen rapidly since then to a present 14,800. During the last decade the proportion of Mexican-Americans has fallen from an original 55% to a present 35% along with 15% Portugese, Spanish, etc., and 50% Anglo-Americans. Meanwhile, the City has increased the area zoned for multi-family residential use from 300 acres, as of 1964, to the current 360 acres. In 1967 the City also prepared a second Master Plan, which is now pending before the City Council and under which the acreage zoned for multi-family use is increased from the current 360 acres to a projected 518 acres.

According to Sheldon Gans, the City's Housing Consultant, who prepared the presently pending Master Plan, the percentages of land area zoned by Union City for single family residence and multi-family residential, are fairly comparable to percentages in other, similar cities and, in fact, its percentage alloted for multi-family use is somewhat higher than usual in other cities.

Of the present 360 acres actually zoned for multi-family use, 260 acres are already developed, leaving a balance of about 100 vacant acres currently zoned multi-family use. The development of these 100 acres would yield, depending on the density, between 1700 to 2900 multi-family housing units.

So far as density is concerned, only two multi-family residential density categories are used in Union City zoning ordinances: (1) RM 1500—meaning that a minimum of 1500 square feet of underlying real property is required to support each multi-family unit, e. g., an acre of realty zoned RM 1500 will yield a maximum of 29 units for each acre; (2) RM 2500—meaning that a minimum of 2500 square feet is required for each multi-family unit, e. g., an acre zoned

for RM 2500 will yield the maximum of 17.4 multi-family units per acre.[2]

No criticism has been directed in this case at these density categories and it appears that they are not unreasonable.

In addition to the 100 vacant acres currently zoned for multi-family use, there are about 100 acres of undeveloped land which, although now zoned for other uses, mainly single family or agricultural, could be rezoned by the City Council for multi-family use and, if so rezoned and developed, could yield, depending on the density, a further 2000–3000 multi-family housing units.

There is evidence in this case that most of the 100 vacant acres, already zoned for multi-family use, are suitable for low cost housing development from a planning standpoint, for example, vacant lots in the Decoto area—18.5 acres (includes the so-called S.P. property—2 acres; the so-called Ashland property—2 acres; the so-called 9th and Decoto property—1.5 acres); the so-called Seven Hills area—3.5 acres; the so-called Soares property—22.5 acres; the so-called Sommers property—8 acres; the so-called Camping property—7.7 acres; the so-called Meyers property—10 acres; the so-called Town & Country Braddock & Logan property—5.5 acres; the so-called Varni property—4.5 acres; the so-called Kaufman and Broad property —8.3 acres and several other smaller parcels, e. g., Beyilacqua (.8 acre) and Fong (3 acres).

Most of these properties have been rezoned from agricultural to multi-family use during 1967–1968, either on application of tract developers (like Kaufman and Broad, Braddock and Logan or Camping Construction Company) or on application of Union City property owners (like Meyers, Soares, Sommers).

There is also evidence that the additional 100 or so acres of vacant land which, although not already zoned for multi-family residential use, would be

---

2. Single family residential zonings are broken down into various minimum lot size requirements ranging from 6,000 square feet per lot to a maximum of 10,000 square feet per lot.

suitable from a planning standpoint for low cost housing development if rezoned for multi-family use—for example, the Varni property, 22 acres (now zoned agricultural but projected for multi-family use); the Wiegmann property, 10 acres (now zoned agricultural but projected for multi-family use); the Nemerov property, 10 acres (now zoned single-family and commercial); the Roncalli property, 20 acres (now zoned for commercial and industrial); the Freitas property, now agricultural but projected for multi- and single-family residential; the so-called Rodriquez property, .6 acre and other properties comprising about 30 acres, e. g., the so-called Corporeto and Kennedy properties.

It is undisputed that until as late as April, 1970, the so-called May property —6.4 acres (to be hereinafter further mentioned) was, not only suitable, but was actually acceptable to SASSO for its low cost housing development—subject only to annexation and rezoning.

The question arises: With so much vacant acreage already zoned for multi-family use and, according to the evidence, generally suitable for low cost housing development, why does plaintiff, SASSO, contend that the zoning plans or practices of Union City are preventing it from building such a project?

SASSO's position, so far as the 100 or so vacant acres already zoned for multi-family use are concerned, is that these sites either involve terrain, construction or parcel assembly problems or they are not available because the owners are not willing and ready to sell at a fair price.

So far as the additional vacant 100 acres, suitable but subject to rezoning, are concerned, SASSO's claim is that it concluded from its experience with the Baker Road site referendum that the rezoning of any other site in Union City for its project would be likewise referendumed, even if there were favorable City Council action, and defeated by vote of the electorate.

For this reason and upon this assumption, according to SASSO, it thereafter limited its consideration of alternate vacant sites to about four sites already zoned for multi-family use but which SASSO had not checked before.. Finding those sites unsuitable because of terrain or construction problems or unavailability for purchase, or both, SASSO has since taken the position that the Baker Road property is the only site ·in all Union City suitable and available for its project and that it would have to insist upon the rezoning of that specific site.

Defendant City, however, points out that even in 1967–1968, prior to focusing on the Baker site, SASSO was considering only small sites 2 to 10 acres, for a comparatively small low cost housing project; that it was then considering only sites already zoned for multi-family use; that, although SASSO has a staff and expenses have been federally financed to the extent of about $200,000, it never made any survey of its own or any significant effort to locate such a site but merely explained its needs to the City Planning staff and looked only at such sites as were suggested by the staff; that the only properties which SASSO even considered, prior to focusing on Baker Road, came to its attention in this way,—three small sites in the Decoto district—the so-called Ashland property (2 acres); the so-called Southern Pacific property (2 acres) and the so-called 8th and Railroad Avenue property (1.5 acres), and a casual inquiry concerning the Varni property (4.5 acres).

SASSO's Rodriquez also made some inquiry about a so-called Niles-Alvarado site (17 acres) but did not go further because, according to Rodriquez, at this time, the fall of 1968, another site, the so-called May property, was called to his attention—again by the City Planning staff.

Although this May property (6.4 acres) was outside the city limits, it would have been suitable for SASSO's project subject, however, to annexation by Union City and pre-annexation assurance of multi-family use zoning.

According to the evidence, this was the first site seriously followed up by SASSO and, when SASSO learned that it could be purchased, it discussed the site with FHA for financing assurance and with Barrett Construction Company concerning cost estimates. According to the evidence, the City Planning staff encouraged SASSO to go ahead and on October 7, 1968, the City Council granted SASSO a "study session" for consideration of annexation and rezoning of the May property. Some residents from Tamarac Knolls (an unincorporated tract outside of, but adjacent to Union City) filed a petition deploring destruction and/or obstruction of the only wooded area in their community and asking that it be reserved for park or recreation use.

The evidence is to the effect that, following this session, members of the City Council made a visit, at SASSO's invitation to Crescent Park, Richmond, California, to inspect a low cost housing project; that the councilmen were impressed; that at luncheon one of the councilmen made a comment to the effect that opposition to annexation of the May site might present problems and that it might be well for SASSO to check other sites—one of which was then actually suggested—the so-called Baker Road site.

When SASSO saw the Baker Road site, consisting of three parcels in separate ownership with a total of 23 acres, lying within the city limits, zoned agricultural but projected on the Master Plan for residential, it followed through with inquiries concerning availability and with estimates from Barrett Construction Company concerning costs. By December 9, 1968, SASSO had obtained options for the purchase of the whole 23 acres at a price of $372,540 with a view to having Barrett Construction Company build a 280 unit multi-family housing project at a total estimated cost of 5.2 million dollars to accommodate moderate and low income renters under the so-called federal Section 236 program (42 U.S.C. §§ 1415, 1421(b), replacing Section 221(d)3 et seq. of the National Housing Act).

From that time forth SASSO abandoned its plan for the 6.4 acre May property and, although the City Planning staff had encouraged SASSO to go ahead with the May site, SASSO never did follow through with any applications for either annexation or rezoning.[3]

The Director of the Union City Planning staff again cooperating with SASSO as he did in the May property situation, recommended approval of the application for rezoning of the Baker Road site (although the Director has since, and on the basis of further consideration, taken the view that 280 units, exclusively multi-family on a single site, is too big for Union City).

SASSO applied in due course to the City Council for rezoning of the Baker Road site to multi-family use. Hearings commenced on March 10, 1962. Citizens from the nearby Westview Estates Tract presented opposition to the rezoning mainly on the ground that a 280 unit multi-family project was too large, out of keeping with the pattern of multi-family housing in the City and would place an unreasonable burden upon school and other public services.

There is evidence that even up to the time of this trial no such large development, exclusively multi-family housing, low cost or otherwise, had ever been constructed in Union City on a single tract. The largest multi-family housing so constructed thus far has been 8 units. This, the City points out, has been the "pattern" in Union City so far as multi-family housing is concerned.[4]

---

3. Marcotte, a developer, in the Spring of 1970, formally and successfully applied to the City Council for annexation and multi-family zoning of this same May property.

4. It is true that there have been housing developments much larger than 280 units, e. g., Kaufman and Broad, projected for an ultimate 825 units on 86 acres and a Lyons development project-

In 1967 Sheldon Gans, the City's housing consultant, who prepared its second Master Plan had recommended that any low cost multiple family housing project on a single site should not exceed about 50 units.

On March 17, 1969, the City Council appointed a study committee to attempt to resolve differences between the protestants and the applicants, but at the next hearing SASSO pressed for a vote notwithstanding requests for further delay pending report of the study committee.

Overruling the protestants, the City Council acted favorably on SASSO's application by a vote of 3–2 to rezone the property to multi-family use—just as SASSO suggested except only to modify the application by reducing the density from RM 1500 to RM 2500. Only Councilmen Alvalais and Williams cast negative votes.

Then, as already narrated, the protestants, taking the position that they had no other recourse, successfully invoked the referendum process.

The evidence is to the effect that after the referendum SASSO, still relying mainly on suggestions by the City Planning staff for possible alternative sites, made some inquiry concerning three or four suggested sites already zoned for multi-family use which SASSO had never checked before, e. g., the Soares property, 22.7 acres; the Camping property, 14 acres, and the Meyers property, 10 acres.

As already stated, SASSO considered these sites unsuitable because of terrain or construction problems or as unavailable for purchase. Within about three and one-half months after the referendum, SASSO was again in this court on a hearing to compel the rezoning of the Baker site notwithstanding the referendum.

The only other check of properties in Union City was made at SASSO's request by one Denton, a realty counselor during a less than two week period just before commencement of this trial on June 1, 1970 and in preparation for it.

With this background SASSO presented testimony at the trial, largely from Denton, to the effect that the Baker Road property was the only site in all Union City suitable and available for SASSO's housing project. The testimony was generally to the effect that, as to the Decoto district parcels (18.5 acres) there would be problems of assembling smaller parcels for a site sufficiently large for a low cost housing project of the size proposed by SASSO, and, further, that a projected state highway would affect about 5 of these 18 acres; as to the Seven Hills property (3.5 acres) the testimony was to the effect that this property was on a hill; as to the Soares property (22.7 acres), the projected highway and a flood control project would affect some of the property; as to Sommers (8 acres) the projected flood control would affect some of the property and, further, the owner wanted to sell 14 acres as one piece, which would involve rezoning at least 6 acres from single to multiple family use; as to the Camping property (7.7 acres), the flood project would affect some of the property and, further, the owner, a construction company, was not really interested in a sale; as to Meyers (10 acres), the owners were not interested in a sale unless as part of a larger 30 acre tract; as to the Town & Country property (5.5 acres), the owners, Braddock and Logan Development Company, were not really interested in a sale and prefer to develop this acreage themselves as part of their larger development; as to the Varni 4.5 acre piece, the owner is not interested in a sale; as

ed for an ultimate 1264 units over 126 acres, but such projects comprise, not multi-family housing exclusively on a single tract, but a planned, phased combination of single-family detached homes, single-family attached homes (town house type) along with multi-family homes and commercial areas, and, as in the case of Kaufman and Broad, the multi-family component generally does not exceed about 8.3 acres.

to the Kaufman and Broad property (8.3 acres) the owner, a tract development company, is not interested in a sale and will probably develop this acreage itself as part of its larger development.

On the other hand, the City, contending that SASSO's representatives, Rodriquez and Marmont as well as Denton, had made only casual, inadequate attempts to locate suitable and available sites, presented testimony through its Planning Director, Petrie, its Director of Public Works, Kirkup, and other witnesses, that most of these properties are suitable from a planning standpoint for a low cost housing development of reasonable size, i. e., 50–75 units on any single site, and some of them for even a project as large as 280 units; that the so-called "problems" are for the most part either non-existent or insubstantial and such as developers of property ordinarily meet and solve; that these properties, contrary to the superficial, inadequate inquiries by SASSO's Rodriquez and Marmont, and its realty counselor, Denton, are for the most part available for purchase through serious, adequate negotiation with their owners.

The City points out, incidentally, that, so far as availability for purchase is concerned, the City has no power to compel owners to sell their property to anyone for a housing project, low cost or otherwise, except, of course, to the extent that the City exercises its power of condemnation.

As already indicated, the evidence in the case shows, and SASSO admits, that the members of the City Council, the City Manager and the City Planning Commission and the Director of Planning and his staff were at all times cooperative, encouraging and helpful to SASSO in its proposal to alleviate the City's housing problem by constructing a federally financed housing project designed for moderate low income residents.

## SUMMATION

■ It must be borne in mind in this case that neither SASSO, nor any other private housing developer, low cost or otherwise, has a right to insist on the rezoning of any particular piece of property unless, as stated by the Court of Appeals, the effect of refusal to rezone that particular piece is to deny decent housing to low cost residents in such manner as to deprive them of equal protection of the law.

■ Taking into consideration all of the circumstances shown by the evidence, this court cannot say that the decision of the Union City electorate in a single instance, annulling the City Council's rezoning of a particular piece of property, establishes a pattern of community action sufficient to support the assumption of SASSO that all applications to rezone other properties for low income housing purposes will henceforth be similarly treated by the voters. Nor would any such assumption be justified by the single additional fact that in the case of the May property some Councilmen had commented to the effect that opposition to annexation of that property for a housing development might present difficulty, especially when SASSO never put such speculation to the test by any formal application for such annexation or rezoning—as Marcotte did successfully early this year.

■ Further, considering zoning plans and practices of Union City, this court cannot say that they have otherwise been such as to so unreasonably limit the amount of property zoned for multi-family use as to make sites unavailable for multi-family use housing— low cost or otherwise.

This is not to say that there is no housing problem in Union City with which the City must concern itself. That there is such a problem is a matter of stipulation in this case to the effect that Union City is experiencing a housing problem similar to the problems of many cities in America; that Union City does not have adequate housing; that some of its low income residents, many of them Mexican-American citizens living in the old Decoto and Alvara-

do sections of the City, are constrained to live in overcrowded, deteriorated and generally sub-standard housing conditions.

The evidence shows that this problem has grown and continues to grow, not because of the City's zoning plans and practices, but because Union City's population has doubled within the ten year period of its corporate existence; the housing situation began to rapidly worsen in about 1966; new residential tracts have been built by private developers, mostly single-family units for sale with a relatively few multi-family units for rent; but all beyond the purchase or rental range of low income residents.

Meanwhile, transit has taken and highway will take structures and displace some of these low income residents; structures in the older sections have deteriorated and should be demolished; relocation of low income residents has become almost impossible in a community whose vacancy rate has rapidly worsened from a comfortable 20% to a tight less than 1%; about 100–150 housing units should be demolished but the City has for this reason refrained from code enforcement.

As reported in 1967 by Sheldon Gans, the City's housing consultant, there was then a need for replacement of low to moderate cost housing of approximately 40–50 units a year for the next 3–5 years; that no sufficient moderate or low cost housing has been, in fact, constructed and that there is, therefore, a present need for about 200 or more such units of multi-family housing to accommodate displaced low income residents.

■ The broader question remains whether, apart from the rezoning referendum here in question, Union City is in other respects accommodating to the needs of its low income residents according to its legal responsibility as stated by the Court of Appeals.[5]

The evidence shows that the City has not been indifferent to its housing problem. Over and above its cooperation with SASSO, including favorable action by the City Council on SASSO's request for rezoning of Baker Road, and in addition to its Planning Commission and staff, the City has appointed a Citizens' Advisory Committee to study, investigate and recommend solutions to the problem; the City has approved and ordered the implementation of the recommendations of this Housing Sub-Committee. Among these are recommendations:

(1) That the City encourage private low cost housing projects under the same Section 236 federal program as SASSO intends to use—with the difference, however, that the projects should be, not large, exclusively multi-family projects on a single site, such as SASSO's 280 units at Baker Road, but smaller projects, about 50–75 units, scattered through various sections of the City. To date no such private projects have appeared except SASSO and SASSO in-

5. Because this court considers itself bound by the law of this case as laid down by the Court of Appeals, it would serve no useful purpose to independently re-examine the question of the existence, nature and extent of a city's responsibility for the housing of its residents except to note that the Court of Appeals cites such cases as Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616, (1969); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Shelley v. Kramer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) and Block v. Hersh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921) for the proposition that equal opportunity in housing is a matter of im-

portance and upon Norwalk v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) (a housing relocation case) for the proposition that there is such a responsibility of the city, quoting from the latter case the statement of Judge J. Skelly Wright in Hobsen v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967) that: " 'Equal protection of the laws' means more than merely the absence of governmental action designed to discriminate; as Judge J. Skelly Wright has said, 'we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and public interest as the perversity of a willful scheme.' "

sists on a large 280 unit multi-family project on a single site.[6]

(2) That the City also encouraged private developers, as in the case of Kaufman and Broad and Lyons, to allocate in their large mixed type residential tracts a certain percentage of low cost homes under so-called Section 235 federal program designed to enable families of moderate income to purchase homes. Although the City has obtained commitments from these two developers to do so, these commitments are not binding and whether such allocation will materialize can be determined only in the long range course of these developments.

(3) That the City seek housing rehabilitation grants and loans for the purpose of bringing deteriorated housing up to code standard and thus reduce need for displacement of families now residing in sub-standard housing. Little progress has been made on this program mainly because HUD disagrees with the City's view that this is practical in the old Decoto and Alvarado districts. HUD has thus far for this reason refused to cooperate financially or otherwise on loan rehabilitation loans and grants, urging that the City seek other remedies.

(4) That the City also encourage and further implement a so-called Section 23 State and County program under which the Alameda County Housing Authority (with which the City has entered into agreement) may lease or rent homes in Union City from private owners on the owners' own terms and in turn relet the homes to low income families, subsidizing such families to enable them to pay the rent. This program has already been implemented by the City to the extent of providing about 35 units of such low cost rental housing.

It will be noted that the City has thus far considered it unnecessary to resort to programs of public housing or urban renewal, taking the position that encouragement of other remedies, mainly remedies dependent on private initiative and cooperation, as set forth above, will prove sufficient. Nevertheless, the problem persists and the responsibility of the City to accommodate, according to the law of this case as stated by the Court of Appeals, remains.

ULTIMATE FINDINGS, CONCLUSIONS AND DECISION

 (1) The effect of the referendum election of July 29, 1969, which annulled the ordinance of the City Council rezoning the so-called Baker Road property at SASSO's request for multi-family use, has not been to deny decent housing in an integrated environment to low income residents of Union City or to deny them equal protection of law.

 (2) Further, the City's zoning plans and practices, as initiated by the City and as they have emerged from said referendum election, are not now such as to be the cause of any failure of the City to accommodate the housing needs of low income families or to deny them equal protection of law.

 (3) There is, nevertheless, a housing problem in Union City, as hereinabove set forth but this housing problem exists, not because of the City's zoning plans and practices, but because of other causes involving the initiatives, preferences and objectives of private residential tract developers and to some extent the desires of private land owners concerning availability of their properties for purchase—matters over which the City has no control except insofar as it uses its fiscal and eminent domain powers to accommodate to the housing needs of low income families.

---

6. Even construction of SASSO's 280 unit project under the so-called Section 236 program would solve only a small part of the low income resident housing problem because the benefits of such a program run mainly to "moderate" as distinguished from "low" income residents. According to the evidence, only about 56 of SASSO's projected 280 units would be available for the "low" income group with whose needs plaintiffs here claim to be concerned.

(4) Failure of the City to thus far solve its housing problem and to accommodate to the housing needs of its low income residents by using its fiscal and eminent domain powers if necessary for that purpose, has not persisted over a period sufficiently long to support a finding that the City has contributed to the problem either affirmatively by its action or negatively by its inaction, thoughtlessness or indifference. Therefore, failure of the electorate to approve the rezoning of the Baker Road site, even considered in the light of the City's past performance, is not such as to amount in effect at this time to failure of the City to accommodate to the housing needs of its low income residents within the meaning of the law.

(5) If, however, the City fails to take within a reasonable time all steps necessary and reasonably feasible under the law to accommodate the needs of its low income residents, the existing housing situation has the potential to become and may reasonably be expected soon to become such that failure or refusal to rezone a particular site for private developers of low cost housing, such as SASSO, considered in the context of any future, persistent failure of the City, would become, in effect, a denial of the needs of low cost housing residents and a denial of equal protection of law.

The conclusions of law based on these findings and the law of this case as set forth by the Court of Appeals in its opinion, supra, are as follows:

(a) That plaintiffs should be denied relief insofar as they pray that the City be now ordered to rezone the particular Baker Road site to multi-family use notwithstanding the referendum rejection by the electorate of such rezoning.

(b) That plaintiffs should be granted, however, relief insofar as they pray that the City take steps necessary and reasonably feasible under the law to accommodate within a reasonable time the needs of low income residents of Union City.

Such steps shall include, so far as necessary and reasonably feasible under the law, not only encouragement and, if possible, implementation of programs dependent on the initiative of private residential developers and upon the cooperation of private landowners or occupants, e. g., Section 236 and 235 programs, the so-called Section 23 Alameda County low cost leasing program and housing rehabilitation grant and loan program (including, if possible implementation of the SASSO housing Section 236 program either as now proposed or as modified) but also public housing programs requiring the exercise of the fiscal and eminent domain powers of the City if such be necessary and reasonably feasible under the law to accomplish the object of this order in the event that private initiative and land owner cooperation (over which admittedly the City has no control) are insufficient to reasonably accommodate the housing needs of low income residents (e. g., public housing, public urban renewal programs and other similar public programs designed for that purpose.)

(c) A reasonable time for accommodating to the housing needs of low income residents is hereby tentatively fixed at not later than May 1, 1971, provided, however, that the City is ordered to report in writing to this court within three months from the date of this order, and regularly at each three month period thereafter, upon what steps, which are necessarily and reasonably feasible under the law, have been taken to accomplish the object of this order.

(d) This court reserves power to change the reasonable time period hereinabove fixed and to grant plaintiffs relief in respect to rezoning the Baker Road, or other particular site, if and when the court finds, upon such further hearing as it may order, that the housing situation has become such that failure to rezone has become, in effect, denial of decent housing to low income residents and denial of equal protection of law.

This Memorandum of Decision constitutes the court's Findings of Fact and Conclusions of Law for purposes of Rule 52, Fed.R.Civ.P., provided, however, that the parties may within ten (10) days from notice of this decision suggest and lodge such further findings consistent with the views herein expressed as they deem necessary; otherwise a judgment will be entered by the court in accordance with the decision herein.