HUNTER *v.* ERICKSON, MAYOR OF AKRON, ET AL.

No. 63.   Argued November 13, 1968.—Decided January 20, 1969.

*Robert L. Carter* argued the cause for appellant. With him on the brief were *Norman Purnell, Bernard R. Roetzel,* and *Lewis M. Steel.*

*Alvin C. Vinopal* argued the cause for appellees. With him on the brief was *William R. Baird.*

*Louis F. Claiborne* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Pollak, Francis X. Beytagh, Jr.,* and *Nathan Lewin.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The question in this case is whether the City of Akron, Ohio, has denied a Negro citizen, Nellie Hunter, the equal protection of its laws by amending the city charter to prevent the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of the majority of the voters of Akron.

The Akron City Council in 1964 enacted a fair housing ordinance premised on a recognition of the social and economic losses to society which flow from substandard, ghetto housing and its tendency to breed discrimination and segregation contrary to the policy of the city to "assure equal opportunity to all persons to live in decent housing facilities regardless of race, color, religion, ancestry or national origin." Akron Ordinance No. 873–1964 § 1. A Commission on Equal Opportunity in Housing was established by the ordinance in the office of the Mayor to enforce the antidiscrimination sections of the ordinance through conciliation or persuasion if possible, but, if not, then through "such order as the facts warrant," based upon a hearing at which witnesses may be subpoenaed, and entitled to enforcement in the courts. Akron Ordinance No. 873–1964, as amended by Akron Ordinance No. 926–1964.

Seeking to invoke this machinery which had been established by the city for her benefit, Nellie Hunter addressed a complaint to the Commission asserting that a real estate agent had come to show her a list of houses for sale, but that on meeting Mrs. Hunter the agent "stated that she could not show me any of the houses on the list she had prepared for me because all of the owners had specified they did not wish their houses shown to negroes." Mrs. Hunter's affidavit met with the reply that the fair housing ordinance was unavailable to her because the city charter had been amended to provide:

"Any ordinance enacted by the Council of The City of Akron which regulates the use, sale, advertisement, transfer, listing assignment, lease, sublease or financing of real property of any kind or of any interest therein on the basis of race, color, religion, national origin or ancestry must first be approved by a majority of the electors voting on the question at a regular or general election before said ordinance shall be effective. Any such ordinance in effect at the time of the adoption of this section shall cease to be effective until approved by the electors as provided herein." Akron City Charter § 137.

The proposal for the charter amendment had been placed on the ballot at a general election upon petition of more than 10% of Akron's voters, and the amendment had been duly passed by a majority.

Appellant then brought an action in the Ohio courts on behalf of the municipality, herself, and all others similarly situated, to obtain a writ of mandamus requiring the Mayor to convene the Commission and to require the Commission and the Director of Law to enforce the fair housing ordinance and process her complaint. The trial court initially held the enforcement provisions of the fair housing ordinance invalid under state law, but the Supreme Court of Ohio reversed, *State ex rel. Hunter*

v. *Erickson,* 6 Ohio St. 2d 130, 216 N. E. 2d 371 (1966). On remand, the trial court held that the fair housing ordinance was rendered ineffective by the charter amendment, and the Supreme Court of Ohio affirmed, holding that the charter amendment was not repugnant to the Equal Protection Clause of the Constitution.

Akron contends that this case has been rendered moot by the passage of the Civil Rights Act of 1968, Pub. L. 90–284, 82 Stat. 73, the decision of this Court in *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968), and the passage of an Ohio Act effective October 30, 1965, Ohio Rev. Code Ann., Tit. 41, c. 4112. It is true that each of these events is related to open housing, but none of the legislation involved was intended to pre-empt local housing ordinances or provide rights and remedies which are effective substitutes for the Akron law.

The 1968 Civil Rights Act specifically preserves and defers to local fair housing laws,[1] and the 1866 Civil Rights Act[2] considered in *Jones* should be read together with the later statute on the same subject, *United States* v. *Stewart,* 311 U. S. 60, 64–65 (1940); *Talbot* v. *Seeman,* 1 Cranch 1, 34–35 (1801), so as not to pre-empt the local legislation which the far more detailed Act of 1968 so explicitly preserves. If the Ohio statute mooted the case, surely the Ohio Supreme Court would have so held when the validity of the Akron ordinance was twice before it after the Ohio statute was passed. Moreover, the sections of the Ohio law which are crucial here apply only to "commercial housing," and on any reading

---

[1] Nothing in the federal statute is to be construed "to invalidate or limit any law of a State or political subdivision of a State" giving similar housing rights, and deference is to be given to local enforcement. Civil Rights Act of 1968, Tit. VIII, §§ 815, 810 (c), 82 Stat. 89, 86.

[2] "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." § 1, 14 Stat. 27, as amended, 42 U. S. C. § 1982.

we can imagine do not apply to Mrs. Hunter's case,[3] though the Akron ordinance does. Finally, the case cannot be considered moot since the Akron ordinance provides an enforcement mechanism unmatched by either state or federal legislation. Unlike state or federal programs, the Akron ordinance brings local people together for conciliation and persuasion by and before a local tribunal. It is precisely this sort of very localized solution to which Congress meant to defer. We therefore reject the contention that this case is moot.

Akron argues that this case is unlike *Reitman* v. *Mulkey*, 387 U. S. 369 (1967) in that here the city charter declares no right to discriminate in housing, authorizes and encourages no housing discrimination, and places no ban on the enactment of fair housing ordinances. But we need not rest on *Reitman* to decide this case. Here, unlike *Reitman*, there was an explicitly racial classification treating racial housing matters differently from other racial and housing matters.

By adding § 137 to its Charter the City of Akron, which unquestionably wields state power,[4] not only sus-

---

[3] The Ohio statute makes it unlawful for "any person" to "[r]efuse to sell . . . or otherwise deny or withhold *commercial* housing from any person because of the race [or] color" of the prospective owner. Ohio Rev. Code Ann. §§ 4112.02 (H) and 4112.02 (H)(1) (Supp. 1967) (emphasis added). "Commercial housing" is defined to exclude "any personal residence offered for sale or rent by the owner or by his broker, salesman, agent, or employee." Ohio Rev. Code Ann. § 4112.01 (K) (Supp. 1967). The statute makes it unlawful to "[p]rint, publish, or circulate any statement or advertisement relating to the sale [of a] . . . personal residence . . . which indicates any preference, limitation, specification, or discrimination based upon race . . . ." Ohio Rev. Code Ann. § 4112.02 (H)(6) (Supp. 1967). Since Mrs. Hunter does not seek commercial housing, or complain of the affront to her sensibilities of hearing a "circulated" statement (if the Ohio statute goes that far) she cannot obtain the relief she seeks under the Ohio statute.

[4] See, *e. g.*, *Evans* v. *Newton*, 382 U. S. 296 (1966); *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961); *Shelley* v. *Kraemer*, 334 U. S. 1 (1948).

pended the operation of the existing ordinance forbidding housing discrimination, but also required the approval of the electors before any future ordinance could take effect.[5] Section 137 thus drew a distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends. Those who sought, or would benefit from, most ordinances regulating the real property market remained subject to the general rule: the ordinance would become effective 30 days after passage by the City Council, or immediately if passed as an emergency measure, and would be subject to referendum only if 10% of the electors so requested by filing a proper and timely petition.[6] Passage by the Council sufficed unless the electors themselves invoked the general referendum provisions of the city charter. But for those who sought protection against racial bias, the approval of the City Council was not enough. A referendum was required by charter at a general or regular election, without any provision for use of the expedited special election ordinarily available. The Akron charter obviously made it substantially more difficult to secure enactment of ordinances subject to § 137.

Only laws to end housing discrimination based on "race, color, religion, national origin or ancestry" must run § 137's gantlet. It is true that the section draws no distinctions among racial and religious groups. Negroes and whites, Jews and Catholics are all subject to the same requirements if there is housing discrimination against them which they wish to end. But § 137

---

[5] Thus we do not hold that mere repeal of an existing ordinance violates the Fourteenth Amendment.

[6] Ordinances may be initiated through a petition signed by 7% of the voters, and the city charter may be amended or measures enacted by the council repealed through a referendum which may be obtained on petition of 10% of the voters.

nevertheless disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who would bar other discriminations or who would otherwise regulate the real estate market in their favor. The automatic referendum system does not reach housing discrimination on sexual or political grounds, or against those with children or dogs, nor does it affect tenants seeking more heat or better maintenance from landlords, nor those seeking rent control, urban renewal, public housing, or new building codes.

Moreover, although the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority. The majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that. Like the law requiring specification of candidates' race on the ballot, *Anderson* v. *Martin,* 375 U. S. 399 (1964), § 137 places special burdens on racial minorities within the governmental process. This is no more permissible than denying them the vote, on an equal basis with others. Cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960); *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Avery* v. *Midland County,* 390 U. S. 474 (1968). The preamble to the open housing ordinance which was suspended by § 137 recited that the population of Akron consists of "people of different race, color, religion, ancestry or national origin, many of whom live in circumscribed and segregated areas, under sub-standard, unhealthful, unsafe, unsanitary and overcrowded conditions, because of discrimination in the sale, lease, rental and financing of housing." Such was the situation in Akron. It is against this background that the referendum required by § 137 must be assessed.

Because the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race, *Slaughter-House Cases,* 16

Wall. 36, 71 (1873); *Strauder* v. *West Virgina,* 100 U. S. 303, 307–308 (1880); *Ex parte Virginia,* 100 U. S. 339, 344–345 (1880); *McLaughlin* v. *Florida,* 379 U. S. 184, 192 (1964); *Loving* v. *Virginia,* 388 U. S. 1, 10 (1967), racial classifications are "constitutionally suspect," *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954), and subject to the "most rigid scrutiny," *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944). They "bear a far heavier burden of justification" than other classifications, *McLaughlin* v. *Florida,* 379 U. S. 184, 194 (1964).

We are unimpressed with any of Akron's justifications for its discrimination. Characterizing it simply as a public decision to move slowly in the delicate area of race relations emphasizes the impact and burden of § 137, but does not justify it. The amendment was unnecessary either to implement a decision to go slowly, or to allow the people of Akron to participate in that decision.[7] Likewise, insisting that a State may distribute legislative power as it desires and that the people may retain for themselves the power over certain subjects may generally be true, but these principles furnish no justification for a legislative structure which otherwise would violate the Fourteenth Amendment. Nor does the implementation of this change through popular referendum immunize it. *Lucas* v. *Colorado General Assembly,* 377 U. S. 713, 736–737 (1964). The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed. Even though Akron might have proceeded by majority vote at town meeting on all its municipal legislation, it has instead chosen a more complex system. Having done so,

---

[7] The people of Akron had the power to initiate legislation, or to review council decisions, even before § 137. See n. 6, *supra.* The procedural prerequisites for this popular action are perfectly reasonable, as the gathering of 10% of the voters' signatures in the course of passing § 137 illustrates.

the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size. Cf. *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Avery* v. *Midland County,* 390 U. S. 474 (1968).

We hold that § 137 discriminates against minorities, and constitutes a real, substantial, and invidious denial of the equal protection of the laws.

*Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

At the outset, I think it well to sketch my constitutional approach to state statutes which structure the internal governmental process and which are challenged under the Equal Protection Clause of the Fourteenth Amendment. For equal protection purposes, I believe that laws which define the powers of political institutions fall into two classes. First, a statute may have the clear purpose of making it more difficult for racial and religious minorities to further their political aims. Like any other statute which is discriminatory on its face, such a law cannot be permitted to stand unless it can be supported by state interests of the most weighty and substantial kind. *McLaughlin* v. *Florida,* 379 U. S. 184, 192 (1964).

Most laws which define the structure of political institutions, however, fall into a second class. They are designed with the aim of providing a just framework within which the diverse political groups in our society may fairly compete and are not enacted with the purpose of assisting one particular group in its struggle with its political opponents. Consider, for example, Akron's procedure which requires that almost any ordinance be submitted to a general referendum if 10% of the

electorate signs an appropriate petition.* This rule obviously does not have the purpose of protecting one particular group to the detriment of all others. It will sometimes operate in favor of one faction; sometimes in favor of another. Akron has adopted the referendum system because its citizens believe that whenever an action of the City Council raises the emotional opposition of *any* significant group in the community, the people should have a right to decide the matter directly. Statutes of this type, which are grounded upon general democratic principle, do not violate the Equal Protection Clause simply because they occasionally operate to disadvantage Negro political interests. If a governmental institution is to be fair, one group cannot always be expected to win. If the Council's fair housing legislation were defeated at a referendum, Negroes would undoubtedly lose an important political battle, but they would not thereby be denied equal protection.

This same analysis applies to other institutions of government which are even more solidly rooted in our history than is the referendum. The existence of a bicameral legislature or an executive veto may on occasion make it more difficult for minorities to achieve favorable legislation; nevertheless, they may not be attacked on equal protection grounds since they are founded on neutral principles. Similarly, the rule which makes it

---

*Section 25 of Akron's city charter exempts the following ordinances from the referendum procedure:

"(a) Annual appropriation ordinances. (b) Ordinances or resolutions providing for the approval or disapproval of appointments or removals and appointments or removals made by Council. (c) Actions by Council on the approval of official bonds. (d) Ordinances or resolutions providing for the submission of any proposition to the vote of the electors. (e) Ordinances providing for street improvements petitioned for by owners of a majority of the feet front of the property benefited and to be specially assessed for the cost thereof."

It is not suggested that any of these exceptions were made with the purpose of disadvantaging Negro political interests.

relatively difficult to amend a state constitution is commonly justified on the theory that constitutional provisions should be more thoroughly scrutinized and more soberly considered than are simple statutory enactments. Here, too, Negroes may stand to gain by the rule if a fair housing law is made part of the constitution, or they may lose if the constitution adopts a position of strict neutrality on the question. See *Reitman* v. *Mulkey*, 387 U. S. 369, 389 (1967) (dissenting opinion of HARLAN, J.). But even if Negroes are obliged to undertake the arduous task of amending the state constitution, they are not thereby denied equal protection. For the rule making constitutional amendment difficult is grounded in neutral principle.

In the case before us, however, the city of Akron has not attempted to allocate governmental power on the basis of any general principle. Here, we have a provision that has the clear purpose of making it more difficult for certain racial and religious minorities to achieve legislation that is in their interest. Since the charter amendment is discriminatory on its face, Akron must "bear a far heavier burden of justification" than is required in the normal case. *McLaughlin* v. *Florida*, 379 U. S. 184, 194 (1964). And Akron has failed to sustain this burden. The city's principal argument in support of the charter amendment relies on the undisputed fact that fair housing legislation may often be expected to raise the passions of the community to their highest pitch. It was not necessary, however, to pass this amendment in order to assure that particularly sensitive issues will ultimately be decided by the general electorate. Akron has already provided a procedure, which is grounded in neutral principle, that requires a general referendum on this issue if 10% of the voters insist. If the prospect of fair housing legislation really arouses passionate opposition, the voters will have the final say. Consequently, the charter amendment

will have its real impact only when fair housing does *not* arouse extraordinary controversy. This being the case, I can perceive no legitimate state interest which in any degree vindicates the action taken by the City here.

As I read the Court's opinion to be entirely consistent with the basic principles which I believe control this case, I join in it.

MR. JUSTICE BLACK, dissenting.

Section 10, Art. I, of the Constitution provides, among other things, that: "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ." But there is no constitutional provision anywhere which bars any State from repealing any law on any subject at any time it pleases. Although the Court denies the fact, I read its opinion as holding that a city that "wields state power" is barred from repealing an existing ordinance that forbids discrimination in the sale, lease, or financing of real property "on the basis of race, color, religion, national origin or ancestry . . . ." The result of what the Court does is precisely as though it had commanded the State by mandamus or injunction to keep on its books and enforce what the Court favors as a fair housing law.

The Court purports to find its power to forbid the city to repeal its laws in the provision of the Fourteenth Amendment forbidding a State to "deny to any person within its jurisdiction the equal protection of the laws." For some time I have been filing my protests against the Court's use of the Due Process Clause to strike down state laws that shock the Court's conscience or offend the Court's sense of what it considers to be "fair" or "fundamental" or "arbitrary" or "contrary to the beliefs of the English-speaking people." I now protest just as vigorously against use of the Equal Protection Clause to bar States from repealing laws that the Court wants the

States to retain.  Of course the Court under the ruling of *Marbury* v. *Madison,* 1 Cranch 137 (1803), has power to invalidate state laws that discriminate on account of race.  But it does not have power to put roadblocks to prevent States from repealing these laws.  Here, I think the Court needs to control itself, and not, as it is doing, encroach on a State's powers to repeal its old laws when it decides to do so.

Another argument used by the Court supposedly to support its holding is that we have in a number of our cases supported the right to vote without discrimination. And we have.  But in no one of them have we held that a State is without power to repeal its own laws when convinced by experience that a law is not serving a useful purpose.  Moreover, it is the Court's opinion here that casts aspersions upon the right of citizens to vote.  I say that for this reason.  Akron's repealing law here held unconstitutional, provides that an ordinance in the fair housing field in Akron "must first be approved by a majority of the electors voting on the question at a regular or general election before said ordinance shall be effective."  The Court uses this granted right of the people to vote on this important legislation as a key argument for holding that the repealer denies equal protection to Negroes.  Just consider that for a moment.  In this Government, which we boast is "of the people, by the people, and for the people," conditioning the enactment of a law on a majority vote of the people condemns that law as unconstitutional in the eyes of the Court!  There may have been other state laws held unconstitutional in the past on grounds that are equally as fallacious and undemocratic as those the Court relies on today, but if so I do not recall such cases at the moment.  It is time, I think, to recall that the Equal Protection Clause does not empower this Court to decide what ordinances or laws a State may repeal.  I would not strike down this repealing ordinance.