STATE OF MONTANA, ex rel., MONTANA CITIZENS FOR THE PRESERVATION OF CITIZEN'S RIGHTS, et al., Plaintiffs and Relators, v. JIM WALTERMIRE, Secretary of State, et al., Defendants and Respondents, and Montana Coal Liability Coalition, Real Party in Interest.

No. 86-400.
Submitted April 30, 1987.
Decided May 22, 1987.
Rehearing Denied July 7, 1987.
738 P.2d 1255.

Goetz, Madden & Dunn; James H. Goetz argued, Bozeman, for plaintiffs and relators.

Mike Greely, Atty. Gen., Helena, James M. Scheier, Asst. Atty. Gen., Helena, H. Elwood English, Secretary of State's Office, Helena, for defendants and respondents.

Gerald J. Neely argued, Billings, for real party in interest.

Shelton D. Williams, Montana Assoc. Defense Counsel, Missoula, for amicus curiae.

MR. JUSTICE SHEEHY delivered the Opinion of the Court.

Following canvass by the Board of State canvassers, respondent Secretary of State has filed in his office and certified to the Governor and the Executive Director of the Legislative Council, that Art. II, Sec. 16 of the Montana Constitution has been amended by initiative through the passage by the electorate of Constitutional Initiative No. 30 (CI-30) on November 4, 1986.

The language of the amendment to Article II, Section 16 as filed and certified by the Secretary of State is not the same language submitted to the electors for their vote on November 4, 1986. The difference in language is material. For that reason, principally, we determine in this original proceedings that the purported amendment of Article II, Section 16 is null and void. We further determine that publication of the proposed initiative measure prior to the election did not follow constitutional mandates.

The further proceedings in this action are in continuation of the original application filed by relators in this Court on August 28, 1986. The relators came to us asking for injunction to remove CI-30 from the November 4 ballot on several grounds. This Court declined to forestall the vote on the initiative. That portion of these proceed-

ings is reported in (Mont. 1986), [224 Mont. 273,] 729 P.2d 1283, 43 St.Rep. 2191.

Following the election, relators filed herein on November 17, 1986 an amended application for injunction enjoining state officials from canvassing the votes cast, or from certifying that CI-30 was duly adopted. The amended application further asked for declaratory relief that CI-30 was unconstitutional, and that the election held on the initiative was unconstitutional and void. Issues were joined on the amended application, and oral argument followed on January 16, 1987. The Board of State Canvassers and the Secretary of State had already performed their official duties with respect to the the passage of CI-30 before oral argument occurred, and thus that portion of the application by relators for injunction is moot. Today we pass upon the validity of CI-30 as certified in light of the process by which it was submitted for approval by the electors.

For perspective, we give the background that spurred the supporters of CI-30 to seek its adoption. Article II, Section 16, of the State Constitution as adopted in 1972 provides:

"Section 16. *The administration of justice.* Courts of justice shall be open to every person, and speedy remedy afforded for injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen's Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay."

In 1983, the legislature promulgated a statute (Section 2-9-107, MCA) which limited the liability of the state government or local governments in tort cases to $300,000 for each claimant and $1,000,000 for each occurrence. The validity of the limitations was attacked on the grounds that they were facially and by application discriminatory in *Pfost v. State* (Mont. 1985), [219 Mont. 206,] 713 P.2d 495, 42 St.Rep. 1957. The State conceded that indeed the statute was discriminatory, but that the validity of the statute could be founded both on rationality and compelling state interest considerations. We had, however, held in *White v. State of Montana* (1983), 203 Mont. 363, 661 P.2d 1272, 40 St.Rep. 507, that the right to bring an action for personal injuries in Montana is a fundamental right and that any statutory impingement on that fundamental right must be measured by a "strict scrutiny" test in order to pass consti-

tutional muster. In *Pfost*, the State sought to distinguish *White*, contending that while the right to sue for personal injury is a fundamental right, the right to recover damages is not, and that statutory limitations on the monetary recovery available to injured plaintiffs were valid. Under this contention, the clause in Article II, Section 16 loomed large that "no person shall be deprived of this full legal redress." We said:

"The use of the clause 'this full legal redress' has major significance. It obviously and grammatically refers to the 'speedy remedy afforded for injury of person, property, or character.' The adjective 'this' means the person, being, or idea that is present or near in place, time or thought or that has just been mentioned. *Webster's New Collegiate Dictionary* (1981).

"The constitutional framers thus construed a 'speedy remedy' as comprehending 'full legal redress.' A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property, or character therefore affects a fundamental right and the state must show a compelling state interest if it is to sustain the constitutional validity of the statute."

In *Pfost*, this Court found no compelling state interest and therefore held that the monetary limitations on damages contained in Section 2-9-107, MCA, were invalid.

After *Pfost*, it was clear that in order for the legislature to adopt a discriminatory limitation on tort damages without a compelling state interest, the adjective "full" would have to be removed from the constitutional provision in Article II, Section 16. That is precisely what the supporters of CI-30 set out to do. They circulated a petition for a constitutional amendment which would revise Article II, Section 16 to read as follows:

"Section 1. Article II, section 16, of the Constitution of the State of Montana is amended to read:

"Section 16. The administration of justice. (1) Courts of justice shall be open to every person, and speedy remedy afforded for ~~every~~ injury of person, property, or character. Right and justice shall be administered without sale, denial, or delay.

"(2) No person shall be deprived of ~~this full~~ legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Work-

men's Compensation Laws of this state. ~~Right and justice shall be administered without sale, denial, or delay.~~

"(3) <u>This section shall not be construed as a limitation upon the authority of the legislature to enact statutes establishing, limiting, modifying, or abolishing remedies, claims for relief, damages, or allocations of responsibility for damages in any civil proceeding; except that any express dollar limits on compensatory damages for actual economic loss for bodily injury must be approved by a ⅔ vote of each house of the legislature.</u>

"Section 2. Effective Date. This amendment is effective on approval of the electorate." (Underlining denotes new material; strikeouts denote deletions.)

When it is proposed that our State Constitution be amended by initiative, there are three ways under our laws by which an elector may become aware of the full text of the proposed amendment: (1) through the petition for the initiative, (2) through the voter information pamphlet, and (3) through publication by the Secretary of State.

The signer of a *petition* for a constitutional initiative may or may not have knowledge of the full text of the proposal. The complete text of the measure must appear on the face or on the reverse side of the petition, or be attached to it. Article XIV, Section 9(1); Section 13-27-201, MCA. A signature on the petition signifies the petitioner agrees to put the constitutional amendment on the ballot and does not necessarily mean the signer agrees to the amendment. Section 13-27-207(1)(c), MCA.

A complete text of the measure must also be set out in the voter information pamphlet. Section 13-27-401(a), MCA. This form of publication of the complete text of the measure is important because the voter information pamphlet, after preparation by the Secretary of State, is by the county election officials mailed to all of the electors. Section 13-27-410(4), MCA.

It is in the voter information pamphlet that a glaring error as to the text of the proposal was committed. In the pamphlet, the voter was told the amendment submitted to him in part was as follows (underlining denotes new material; strike-outs denote deletions):

"(2) No person shall be deprived of <u>this full</u> legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Work-

men's Compensation Laws of this state. ~~Right and justice shall be administered without sale, denial, or delay.~~"

We have noted in the foregoing discussion the critical importance of the words "this full" in Article II, Section 16. In the voter information pamphlet, the very words, "this full" which brought about the effort to amend Article II, Section 16 by the supporters of CI-30, were not *deleted,* but were indicated as being *inserted.* The text in the voter information pamphlet of the amendment is directly opposite to what CI-30's supporters intended. And critically, in this case, the voter information pamphlet was the *only* source of information for the voter as to the *full text* of the proposed amendment by initiative.

The gravity of the error in the voter information pamphlet can be best understood in the light of applicable law. Our statutes, providing as they do for the inclusion of the complete text in the petition for constitutional amendment (Section 13-27-207(1)(c)), MCA, in the voter information pamphlet (Section 13-27-401(1)(a)), MCA, and by publication, (Section 13-27-311, MCA,) contemplate that the ballot issue should clearly state the substance of the proposition. *Board of Education of the City of Eldorado v. Powers* (1935), 142 Kan. 664, 51 P.2d 421. It is elementary that voters may not be misled to the extent they do not know what they are voting for or against. *Burger v. Judge* (U.S.D.C. Mont. 1973), 364 F.Supp. 504, *affd.* 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465. Due process is satisfied if the voters are informed by or with the ballot of the subject of the amendment, are given a fair opportunity by publication to consider its full text, and are not deceived by the ballot's words. *Kohler v. Tugwell* (U.S.D.C.La.1969), 292 F.Supp. 978, *affd.* 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755. Where a ballot proposal is misleading, the remedy is to void the election. *West Shore Community College v. Manistee County Board of Commissioners* (1973), 389 Mich. 287, 205 N.W.2d 441.

A second major defect in the procedures leading up to the vote on CI-30 was the failure to publish the proposed amendment in accordance with Article XIV, Section 9 of the Montana Constitution.

There are three ways in which our state constitution may be amended, (1) through legislative referendum (Article XIV, Section 8), (2) through a further constitutional convention (Article XIV, Section 1) or, as in this case, (3) by initiative (Article XIV, Section 9). Although the people of this state have retained the exclusive right of governing themselves, and the right to alter or abolish the

constitution or form a government whenever they deem it necessary (Article II, Section 12), it is nonetheless true that as long as the State Constitution is in effect, the people may amend the constitution by initiative only in the manner provided by the constitution. "The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." *Hunter v. Erickson* (1969), 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616.

In cases of amendment by initiative, Article XIV, Section 9 is the constitutional mandate with respect to publication:

"(2) The petition shall be filed with the Secretary of State. If petitions are found to have been signed by the required number of electors, the Secretary of State shall cause *the amendment* to be published as provided by law twice each month for two months previous to the next regular state-wide election. (Emphasis added.)"

The legislature, presumably acting in conformance with Article XIV, Section 9, has provided:

"13-27-311. Publication of proposed constitutional amendments. (1) If a proposed constitutional amendment or amendments are submitted to the people, the secretary of state shall have the proposed amendment or amendments published in full twice each month for two months previous to the election at which they are to be voted upon by the people, in not less than one newspaper of general circulation in each county.

"(2) The secretary of state may arrange for newspaper, radio or television publication of proposed constitutional amendments in each county. A summary of the amendment as provided by the attorney general, as described in 13-27-312, or 13-27-315 would suffice for the publication required by this section and should be made at least twice each month for 2 months previous to the election."

It is undisputed in this case that the Secretary of State did not arrange for radio and television publication of proposed CI-30 in any county of this state. It is further undisputed that the Secretary of State did not have the proposed amendment in full published twice each month prior to the election in any newspaper of general circulation in any county of this state. Instead, the Secretary of State did contract to have published in newspapers in the counties of this state the "statement of purpose" of CI-30 which is formulated by the Attorney General. (There is an indication in the brief of the Secretary of State that even the Attorney General's statement was not

published for the required length of time in Gallatin County; however, we do not regard that circumstance in this decision.)

The Attorney General's statement of purpose, which was published in the voter information pamphlet, and also in the newspapers, stated:

"This initiative would amend the Montana Constitution to authorize the legislature to determine the rights and remedies for injury or damage to person, property, or character. Currently the Constitution does not permit limits on these rights and remedies. A two-thirds vote of each house of the legislature would be required to set dollar limits on damages for economic loss resulting from bodily injury."

It is obvious that the Attorney General's statement does not comprise the full text of the proposed measure, CI-30. Only the most daring would contend that the Attorney General's statement is a "summary" of the initiative measure. "Summary" must cover the main points succinctly. *Webster's New Collegiate Dictionary* (150th Ed. 1981).

What is the legal consequence of the failure of publication in this case? Three cases set out the rule for us:

In *State ex rel. Woods v. Tooker* (1894), 15 Mont. 8, 37 P. 840, the relator sought a writ of mandamus, requiring the county clerk and recorder of Lewis and Clark County to file in his office a certificate of the relator's nomination for the office of county commissioner. The respondent answered that the certificate for the office of county commissioner was invalid under the Constitution, in that the amendment had not been properly adopted so that there was no vacancy in the office. What happened was that the constitutional amendment was proposed by the legislative assembly in 1891 and voted upon by the electors in 1892. The 1889 Constitution required proposed amendments from the legislative assembly to be published for three months previous to the next general election. In fact, this particular amendment was published for only two weeks.

The Montana Supreme Court held (DeWitt, J.) that the amendment was null and void because of the faulty publication.

First, Justice DeWitt rejected the claim of the relator that the constitutional language was merely directory. The Court said:

"In another place in the same work [Cooley's Constitutional Limitations] we find the following language:

" 'The fact is this: that whatever constitutional provision can be looked upon as directory merely, it is very likely to be treated by the legislature as if it was devoid even of moral obligation and to be,

therefore, habitually disregarded. To say that a provision is directory, it seems, with many persons, to be equivalent to saying that it is not law at all. That this ought not to be so must be conceded; that it is so, we have abundant authority for saying. If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory and, if by the legislature habitually disregarded, it seems to us that there is all the more urgent necessity that the courts should enforce it and it also seems to us that there are few evils which can be afflicted by strict adherence to the law so great as that which is done by an habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed.'

". . .

"We believe this to be the sound and only safe doctrine. It seems to us that the rule which gives to the courts and other departments of the government a discretionary power to treat a constitutional provision as directory, and to obey it or not, at their pleasure is fraught with great danger to the government. We can conceive of no greater dangers to constitutional government, and to the rights and liberties of the people, than the doctrine that permits a less, latitudinous, discretionary construction of the organic law. 'We are taught by the constitution itself that those who administer this government are divided into three coordinate departments; each of these can only act within its own limited sphere, and they, respectively, are the servants of the sovereign power of the people. There is no power above the people. There is no discretionary power granted in the constitution for either of the departments, nor for all of them united to exercise a discretionary expansion and flexible power against its rigid limitations, even though such limitations were imposed by improvident jealousy. If abuse exists by reason of defects in the constitution, present or prospective, the true source of authority, the people, have the power, and doubtless the wisdom and patriotism, to correct them; and this, in the American idea is the safe and only depository . . .' "
15 Mont. at 12-14, 37 P. at 842.

The Supreme Court in *Tooker* added,

". . . We therefore have this situation: The method for amendment is provided by the solemnity of the constitutional enactment, and another method of amendment has been attempted to be invoked.

We can see no other result but that such attempt is nugatory, and of absolutely no avail . . . . "
15 Mont. at 18, 37 P. at 844.

A second case of constitutional import is *Durfee v. Harper* (1899), 22 Mont. 354, 56 P. 585. It is an interesting case because of its background. The action began on a petition by Durfee to require the respondent to transfer to a corporation certain shares of stock. Before the Supreme Court got to the main case, however, there was an unusual development. Chief Justice Brantley had represented one of the parties when he was a county attorney in Deer Lodge County and was thus disqualified from sitting on the Supreme Court case. The Supreme Court, then consisting of three members, had called in Judge Frank Henry, from the Sixth Judicial District. The Hon. Wilbur F. Sanders, as amicus, brought to the attention of the Court that it was possible that Judge Henry could not properly sit for the reason that the amendment of the constitution allowing the Supreme Court to call in a district judge to sit was probably unconstitutional.

It appears that the amendment to the Constitution permitting the Supreme Court to call in a district judge to sit had been approved by the voters upon referendum from the Fifth Legislative Assembly. The 1889 Constitution required that an amendment proposed by the legislature should be enrolled in full on the journals of the legislature. This had not been done, and apparently Judge Sanders argued that the lack of such enrollment made the constitutional amendment nugatory. The two judges then constituting the Supreme Court agreed and a two judge court decided the constitutional issue. They looked to *State ex rel. Tooker* above and other cases. Our Supreme Court declared:

". . . This distinction between the authority of the legislature in relation to enacting laws and proposing changes in the constitution must not be overlooked, for it emphasizes in an unmistakable way the measure of power which can be exercised effectively by delegated representatives, and that which alone can be exercised by the people in their sovereignty. The legislative assembly can no more subtract from the various steps specified in the organic act to be taken by itself antecedent to submitting amendments to the constitution, than it can amend the constitution without such submission to the people. It may attempt to propose such amendments to the full number allowed, but it is powerless to make its proposals operative to accomplish the fact of an amendment, without first exercising

and pursuing its authority in the single mode of proceeding which the people have directly prescribed in all instances where the legislature passes a proposed amendment at all. No argument is needed to uphold the rule that the provisions of our constitution are mandatory and prohibitory, unless by express words declared to be otherwise. The constitution so declares, and the reasoning of Justice DeWitt in *State v. Tooker,* 15 Mont. 8, 37 Pac. 840, is conclusive upon that proposition. That decision too is to a great extent controlling of the point under examination, as it was there decided that, where the mode by which an amendment to be made to the constitution is clearly pointed out by the constitution itself, such mode is a substantial and essential part of the instrument itself, to be regarded by the legislature as exclusive, and as not permitting any other mode or form to be observed.

". . .

"We conclude therefore that the failure to enter on the legislative journals the proposed amendment under which Judge Henry was invited to sit was a disobedience of the constitution itself, and that our duty in expounding the supreme law compels us to decide that the proposed amendment never was proposed as required, and therefore never ought to have been submitted. It was a nullity before it reached the people and was not animated by them, because their own solemn commands empowering its proposal, and specifying the mode thereof, had been entirely ignored by the proponent." 22 Mont. at 362-364, 56 P. at 855.

The third case is *Tipton v. Mitchell* (1934), 97 Mont. 420, 35 P.2d 110. Two aspects of this case stand out: 1) The legislature attempted to cure the defect of not placing the constitutional amendment fully on its journals; 2) The Court rejected the idea of two earlier cases that *substantial compliance* was sufficient.

*Tipton v. Mitchell* involved a budget act which was proposed by the legislature for constitutional amendment. The proposed amendment had been passed by the legislature in the 22nd Legislative Assembly (1933) and Governor Erickson signed the proposed budget act. The proponents recognized the defect in failing to enroll the amendment in full in the journals and accordingly, Governor Cooney (who had succeeded the resigned Governor Erickson) called the 23rd Legislative Assembly into extraordinary session where attempt was made to cure the defect by recitations that the proposed amendment had been passed and was then set forth in full in the journals

of the extraordinary session. When the case came to the Supreme Court, we said:

"In *Durfee v. Harper*, 22 Mont. 354, 56 Pac. 582, 585, it appeared that the proposed amendment to the Constitution had not been entered in full on the respective journals of the two Houses of the Assembly, as required by section 9 of Article XIX of the Constitution. After a careful examination of all of the authorities in point, the court declared that the amendment was null and void. The learned Justice Hunt, who wrote the opinion, said: 'An amendment to the constitution, like the constitution, obtains life by the direct power of the people. No other authority can be put above them, or act for them, in respect to effecting changes in their organic law.' It was pointed out that while the legislators are supreme in the exercise of the constitutional law-making power, in respect to the Constitution they are by that instrument's terms proposers only of amendments. *'The legislative assembly can no more subtract from the various steps specified in the Organic Act to be taken by itself antecedent to submitting amendments to the constitution, than can it amend the constitution without such submission to the people.'* The court declared that in expounding the supreme law it was compelled to decide the proposed amendment never was proposed as required, and therefore never ought to have been submitted. 'It was a nullity before it reached the people, and was not animated by them, because their own solemn commands empowering its proposal, and specifying the mode thereof, had been entirely ignored by the proponent.' " (Emphasis added.)
97 Mont. at 429, 430, 35 P.2d at 114.

Then the court in *Tipton* went on to discuss two earlier cases where it had been held that substantial, rather than literal compliance with the constitution was enough. Those cases were *State ex rel. Hay v. Alderson* (1914), 49 Mont. 387, 142 P.2d 210, and the *Tax Commission Case (Martien v. Porter)* (1923), 68 Mont. 450, 219 P. 817. This Court rejected substantial compliance saying:

"All members of the court as now constituted are not satisfied with the majority opinion in the *Tax Commission Case.* Did not the court say in *Durfee v. Harper*, supra: 'Thus, the proposition comes back to the statement that from the people, as a source, alone flows the delegated power of the legislature to even *propose* amendments to those "unvarying rules" by which "alike the government and the governed" are controlled, and where those rules adopted by the people are part of their constitution, and lay down how this power may

be exercised by the legislature, there is no discretion in that body to ignore the commands of the fundamental authority, or override its limitations in great or small matters; and this principle holds good, not only for the legislative, but, so far as applicable, for the judicial and executive, departments of the government as well?' Is it possible, where a Constitution is involved, to declare a provision mandatory at one time and the same provision directory at another?" (Emphasis added.)

97 Mont. at 431, 37 P.2d at 114.

The faulty compliance with the constitutional requirement was enough to void the proposal and the court in *Tipton v. Mitchell* stopped the question from being presented to the people for their vote at the upcoming election.

■ The foregoing cases are determinative. The present Montana Constitution requires *"the amendment"* to be published as provided by law. The legislature provided that "a summary of the amendment" would suffice. Section 13-27-311, MCA. The statute, if permitted, would itself constitute an amendment to the Constitution insofar as initiatives are concerned and should not be allowed. Any initiative amendment adopted in that manner is, of course, void.

The problem with the error in the voter information pamphlet is not so much that voters might have been misled, although that possibility certainly exists, and the error is significant. The greater problem is the right of the electorate, and responsible officials after the election, to know the exact language upon which the vote was taken. If there is any absolute in this matter, it is that the State Constitution must be expressed in words. Those words must reflect the considered will of the people. The State Constitution cannot be amended by fugitive forms.

Yet the argument is made that because of the widespread availability of radio and television and the use of public panels and the like, that the material flaw in presenting the language of this amendment to the voters should be overlooked on the grounds that there is a reasonable probability that a substantial part of the electorate knew what they were voting upon.

To adopt such an argument is to say that the Constitution may be amended merely by an undefined idea, an idea as vague as "to cure abuses in the courts," as argued by the proponents in the voter information pamphlet. But only *words* express ideas, and ideas must be translated to words or ideas cannot be communicated. Thus one person's idea of "tort reform" may be another person's idea of "tort

irresponsibility." It is only when express words plain in their meaning outline ideas in clear sharp detail that human minds can grasp the ideas, and their legal consequences. Reasonable minds can and do differ as to the legal consequences of "no person shall be deprived of legal redress for injury" and "no person shall be deprived of *this full* legal redress for injury." That difference is the reason for CI-30 in the first place.

These examples are enough to prove that words, or the lack of them, do make a difference. We cannot blind ourselves to this difference, and hold that words given to electors to vote upon are not to be included in the results of their vote. The words in CI-30 certified by the Board of State Canvassers omit the words "this full" given to the electors for their vote. The certified version of CI-30 is therefore illegal and void, because it does not express the considered will of the voting public. The certified language of CI-30 was never. submitted for a vote in the manner expressly required by the State Constitution.

There is evident wisdom in what the constitutional framers provided with respect to publication where initiatives are concerned. In the other two cases, that of convention and of legislative referenda, the proposed amendments are carefully worked over by contending parties whose governmental business at the time is to construct either a constitution or propose amendments to it. In the case of an initiative by the people, not enough adverse input occurs to justify the conclusion that a careful study has been made of the proposed amendment prior to its submission. This case is an example of that. The requirement for publication in full of the true words of an amendment proposed by initiative is necessary so that the electors can make an intelligent choice.

The 1972 convention debate (it was not so much a debate as a discussion) on the subject of publication of amendments by initiative is found in Vol. III, beginning at page 508 and extending to 514. The discussion arises on the motion of Delegate Blend to amend the words "at least one newspaper in each county" and to insert instead "the communications media." The discussion that follows indicates the concern of the delegates that technological developments following 1972 might be such that publication by other means than by newspapers would become feasible. In adopting the present language of Article XIV, Section 9, the Constitutional Convention left open to the legislature to provide for publication in the newsprint and in the

broadcast media, *but nowhere do the constitutional framers discuss publishing less than the full amendment.*

We have examined the history of other constitutional amendments that have occurred since 1972. It is fortunate that CI-30 is the only constitutional initiative which is affected by this decision.

It is noteworthy that paragraph 3 of CI-30 would take away from the judiciary the power to pass upon the validity of legislative enactments establishing, limiting, modifying or abolishing remedies or damages. The Attorney General's statement of purpose fails to note this significant transfer of judicial power, a point which any "summary" of CI-30 should have included for publication. We note this point as further demonstration that the publication of the Attorney General's statement of purpose was inadequate to inform the voter of the effect of CI-30, if adopted.

Therefore we determine as a declaratory judgment that the proposed adoption of amendment to Article II, Section 16 of the 1972 Montana Constitution through CI-30 has failed because of material constitutional defects in the manner it was presented to the electors for a vote. It is therefore nugatory and of no effect.

MR. JUSTICES HARRISON and HUNT and HON. JOSEPH B. GARY, District Judge, sitting for MR. JUSTICE MORRISON, concur.

MR. JUSTICE WEBER, dissenting:

The opinion of the majority, while perhaps defensible on technical legal grounds, fails completely to respect the will of the voters of Montana. The plaintiffs have not shown that the voters were materially misled under any of the issues raised here. I conclude that upholding the people's vote is at least as defensible as the majority's opinion, on legal grounds. It is decisively preferable as an expression of this Court's role in the initiative process.

I first set forth some basic principles on amendment of our Montana Constitution by the initiative process. These basic principles are applicable to all issues before the Court. In their 1972 Constitution, the people of Montana reserved all political power to themselves. Mont. Const. Article II, Section 1 states:

"All political power is vested in and derived from the people. All government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole."

By the 1972 Constitution the people of Montana have retained the

exclusive right of governing themselves and have also retained the right to alter the Constitution. Mont. Const. Article II, Section 2 states:

"The people have the exclusive right of governing themselves as a free, sovereign, and independent state. They may alter or abolish the constitution and form of government whenever they deem it necessary."

By a provision which was not included in the 1889 Constitution, the 1972 Constitution provides that the people may propose constitutional amendments by initiative, stating in Mont. Const. Article XIV, Section 9:

"(1) The people may also propose constitutional amendments by initiative. Petitions including the full text of the proposed amendment shall be signed by at least ten percent of the qualified electors of the state. That number shall include at least ten percent of the qualified electors in each of two-fifths of the legislative districts.

"(2) The petitions shall be filed with the secretary of state. If the petitions are found to have been signed by the required number of electors, the secretary of state shall cause the amendment to be published as provided by law twice each month for two months previous to the next regular state-wide election.

"(3) At that election, the proposed amendment shall be submitted to the qualified electors for approval or rejection. If approved by a majority voting thereon, it shall become a part of the constitution effective the first day of July following its approval, unless the amendment provides otherwise."

These provisions emphasize the desire of the people to be able to amend the Constitution by initiative without being required to go through any of the three branches of government, and in particular the judicial branch. In considering the present initiative, this Court should carefully honor the basic rights retained by Montana's citizens. These rights include the right of the people to alter or abolish the 1972 Constitution — a reserved power of unlimited breadth. The present initiative was approved by a clear majority of the electorate. This amendment by initiative vote of the people should be invalidated only if we conclude there is a reasonable probability that a substantial part of the electorate were misled in casting their votes in favor of the Initiative. In considering the issues I also keep in mind that we now have multi-faceted means of communication with the electorate, which include not only publication in newspapers,

but also both television and radio, all of which were extensively used in the months preceding the vote on the present Initiative.

The majority has invalidated the Initiative ballot on the basis of two errors. The first is an error in printing the text of the Initiative in the 1986 Voter Information Pamphlets. Sections 13-27-401 through 410, MCA, set forth the requirement and procedure for the secretary of state to prepare and distribute to Montana voters information pamphlets on ballot issues at the next election. These include requirements that for each ballot issue the pamphlets must contain the title, fiscal statement, and complete text, as well as the form in which the issue will appear on the ballot, and arguments and rebuttal arguments submitted by proponents and opponents. As the majority has pointed out, there was an error in the printing of the full text of CI-30 in the voter information pamphlets prepared for the 1986 general election. The error was in subsection (2), where the words "this full" were printed this full, instead of this full. The voter information pamphlet does not explain what is meant by the underlining and interlineation. However, underlining is commonly used to designate material which is being added; interlineating to designate material deleted. The error in printing indicates that the amendment adds, rather than deletes, the words "this full" from Mont. Const. Article II, Section 16.

The error was discovered on October 23, 1986. The Secretary of State points out that this was after his office had sent the pamphlets to the counties and the counties had distributed the pamphlets to the voters. The Secretary of State took what he argues was the only possible corrective action at that late date: he issued a news release which explained that an error had occurred in the voter information pamphlets, and described that error. Nevertheless, the majority holds that the error misled the voters on a critical aspect of CI-30.

The text of the Initiative as misprinted in the voter information pamphlets was only a part of the information contained in the same pamphlets. The pamphlets also contained extensive printed arguments by both proponents and opponents of the measure. A voter reading the pamphlet would have understood that the opponents were opposing the elimination of the words "this full" from the constitutional provision. The majority also fails to consider the publication by the Secretary of State describing the error in the voter pamphlets, and the wide discussion of this Initiative in the printed media, the radio and television, as well as the debate as reported in the media. Without question this Initiative generated a widespread

media discussion which continued for months prior to the election date.

The plaintiffs chose to bring this declaratory judgment action in this Court rather than proceeding in district court. As a result, neither side has had the opportunity to produce evidence of the effect of the error upon the vote of the electorate. Plaintiffs contend that because the proponents cannot prove that the error had no effect on the vote, the election must be invalidated. Since the plaintiffs chose this forum where no such evidence could be presented, I have some difficulty attaching validity to this contention.

I have attempted to consider all of the foregoing factors, and to keep in mind carefully the rights of the people to amend their Constitution by the initiative process. I recognize that the error in the voter information pamphlets is significant and presents a difficult issue. However, based upon the nature of the error and the wide availability of accurate information regarding the Initiative through all forms of media, I conclude that the error is not a proper basis for invalidating the election. I cannot conclude there is a reasonable probability that a substantial part of the electorate was misled by the error. In the absence of evidence to the contrary, I conclude that the electorate of Montana has the capacity to analyze the issue raised by the Initiative and to reach an accurate decision on the vote to be cast notwithstanding the error in the voter information pamphlet. I would hold that the error in printing the text did not invalidate the election.

The second reason used by the majority to invalidate the election on CI-30 is publication in each county of summary language instead of the entire text of the Initiative. Article XIV, Section 9(2) of the Montana Constitution provides, in relevant part:

". . .the secretary of state shall cause the amendment to be published as provided by law twice each month for two months previous to the next regular state-wide election."

The majority holds that this constitutional provision requires the Secretary of State to publish the full text of the amendment. The legislature obviously disagreed, because it adopted the following statutory provisions for publication in Section 13-27-311(2), MCA:

"The secretary of state may arrange for newspaper, radio, or television publication of proposed constitutional amendments in each county. A summary of the amendment as provided by the attorney general, as described in 13-27-312 or 13-27-315, would suffice for the

publication required by this section and should be made at least twice each month for 2 months previous to the election."

The majority holds that this statute is unconstitutional because it does not require the full text of the amendment to be published and instead allows a summary of the amendment as provided by the Attorney General. It has not been explained why this issue was not raised in the plaintiffs' initial appearance before this Court in October 1986.

The official transcript of Montana's 1972 Constitutional Convention (Con Con) does not answer the question of intent conclusively; there is no statement of the collective view of the delegates. The discussion of this section centered around whether publication must be in newspapers or whether it could be through other media, such as television. In amending the section to allow publication other than in newspapers, the word "full" was deleted from the text of the section before "amendment shall be published." The Con Con transcript contains no explanation of that deletion.

The majority cites *State v. Tooker* (1894), 15 Mont. 8, 37 P. 840, as controlling on this issue. In that case, a constitutional amendment was published for two weeks before the election, instead of "published in full in at least one newspaper in each county (if such there be), for three months previous to the next general election . . . " as required by Montana's 1889 Constitution, Article 19, Section 9. This Court stated that:

"The method for amendment is provided by the solemnity of the constitutional enactment, and another method of amendment has been attempted to be invoked. We can see no other result but that such attempt is nugatory, and of absolutely no avail."
*Tooker*, 37 P. at 844.

It is important to note that the 1889 Constitution required publication *in full* of the constitutional amendment *for three months*, while publication in *Tooker* was only made for two weeks. The 1889 constitutional provision sets forth the considered judgment of the people that a century ago it was essential to publish a constitutional amendment in full and for a period of three months previous to an election. That was a clearly understandable and reasonable requirement during a period of time in which newspaper publication was the only reasonable means of publication other than word of mouth. The present age of mass electronic communication presents an entirely different situation. The present constitutional provision does not require the amendment to be published "in full". In addition,

the 1972 constitutional provision provides that the amendment is to be published "as provided by law". Clearly the people recognized by this provision that it was appropriate for the legislature to provide the manner of publication. The legislature did so in Section 13-27-311, MCA, and provided that the summary of the amendment would suffice. I therefore conclude that *Tooker* is not controlling in the present case.

After having studied the text of Mont. Const. Article XIV, Section 9(2) and the transcript of the discussion at the Con Con, I conclude that allowing publication of the statement of purpose instead of the text of the Initiative does not exceed the discretion given to the legislature in providing for publication of proposed amendments. I would therefore conclude that Section 13-27-311(2), MCA, is not unconstitutional. I find no indication that a substantial part of the electorate was misled, and conclude that publication of the statement of purpose instead of the text of the Initiative is not cause to void the election.

The majority has not addressed the three other issues which the plaintiffs raised. I will, therefore, discuss them only briefly. First, plaintiffs argue that the Initiative is unconstitutional because it proposes more than one amendment in a single ballot. That argument fails under the established test of whether the amendment effects and carries out one general object or purpose connected with one subject. *State v. Cooney* (1924), 70 Mont. 355, 366, 225 P. 1007, 1011. Here, the Initiative alters only one paragraph of our Constitution and covers one general subject. To require that each word or phrase changed in this Initiative be submitted separately to the voters would be an exultation of form over substance.

The plaintiffs also argue that the Initiative would violate the doctrine of separation of powers by transferring judicial power to the legislature. Mont. Const. Article III, Section 1 prohibits one branch of government from exercising any power belonging to one of the other branches except as the Constitution permits. There is no prohibition of the people shifting a power belonging to one branch to another branch. I conclude that the Initiative does not violate the constitutional provision on separation of powers.

Finally, plaintiffs argue that the Initiative is unlawful or unconstitutional because the Attorney General's statements of purpose and implication are untrue, misleading, and prejudicial. The standard of review of the adequacy of the statements was set forth in *State ex*

*rel. Wenzel v. Murray* (1978), 178 Mont. 441, 448, 585 P.2d 633, 637-38:

". . . as long as the Attorney General in his explanatory statement uses 'ordinary plain language,' explains the general purpose of the issues submitted, in language that is true and impartial, and not argumentative or likely to create prejudice either for or against the issue, he has followed the law . . . His discretion as to the choice of language . . . is entirely his."

Here, the Attorney General was faced with an amendment to a constitutional provision with uncertain legal implications, stemming from this Court's non-unanimous decisions in *White* and *Pfost*. He was limited, under Section 13-27-312, MCA, to a statement of 100 words to explain the purpose of the measure and 25 words for the statement of implication. Such statements cannot capture all ramifications of the Initiative. The Initiative itself is short enough to be easily read, giving the statements a more limited function than they would have with a longer initiative. Balancing all of these factors, I would conclude that the Attorney General's statements explain the general purpose of the amendment in ordinary plain language in a sufficient manner to meet the requirements of Section 13-27-312(4), MCA, and to maintain the neutrality of the government.

Because I conclude that none of the issues raised by plaintiffs require that the results of the November 1986 election on CI-30 be declared void, I would deny the application for declaratory judgment.

MR. CHIEF JUSTICE TURNAGE and MR. JUSTICE GULBRANDSON concur in the foregoing dissent.