JUSTICE NELSON,
dissenting.
I. Overview
¶30 “ ‘[T]here are few evils which can be afflicted by strict adherence to the law so great as that which is done by an habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed.’ ”[1]
¶31 The only action that this Court is statutorily authorized to take in the present cases is clear. “If, upon review, the attorney general or the supreme court revises the petition form or ballot statements, any petitions signed prior to the revision are void.” Section 13-27-316(4), MCA (emphasis added). Here, the Court has revised the ballot statements. Accordingly, “any petitions signed prior to the revision are void.” Section 13-27-316(4), MCA. And without valid petitions, the ballot issue may not appear on the ballot. See §§ 13-27-307, -308, MCA; see also e.g. § 13-27-316(3)(c)(iii), MCA. That is the holding we are required to reach.
¶32 Regardless that this result may seem harsh to some, it is the result mandated under the initiative procedures adopted by the people through their elected representatives. This Court is required to scrupulously observe and obey those procedures. We are not at liberty *250 to rewrite them, nor is it our prerogative to disregard them. Ahd there is no “obvious legislative intent” justifying what the Court has done here.
¶33 In this regard, it should be noted that the timetable laid out by the Legislature is not as “impossible” as the Court majority would have us believe. That timetable proceeds as follows:
1. A proponent of a ballot issue first submits the proposed issue to the Secretary of State, together with draft ballot statements (the statement of purpose, fiscal statement, and statements of implication). Section 13-27-202(1), MCA. The Secretary of State forwards a copy of the proposed issue and statements to the Legislative Services Division and, thereafter, to the Attorney General. Section 13-27-202(1), (4), MCA. The Legislative Services Division is given 14 days to complete its review, § 13-27-202(2)(b), MCA, and the Attorney General is given 30 days to complete his review, § 13-27-312(8)(a), MCA.
2. Once approved, the proponent may circulate petitions for the purpose of signature gathering starting one year before the deadline for filing the signed petitions with county election officials. Section 13-27-202(1), (5)(b), MCA. Signed petitions may be submitted to county election officials as early as nine months, but no later than four weeks, before the deadline for filing the petitions with the Secretary of State. Section 13-27-301(1), MCA. The deadline for filing the petitions with the Secretary of State is the third Friday of the fourth month prior to the election (here, July 16, 2010). Section 13-27-104, MCA. Thus, the proponent of a ballot issue for the November 2, 2010 ballot could theoretically start circulating petitions as of June 16, 2009, and submitting signed petitions to county election officials as of October 16,2009, but no later than June 16, 2010.[2]
3. County election officials are required to verify names and signatures within four weeks after receiving the sheets or sections of a petition. Section 13-27-303(1), MCA. The petitions are then forwarded to the Secretary of State. Section 13-27-304, MCA.
4. Once a sufficient number of signatures have been filed with the Secretary of State, he or she must “immediately” certify to the *251 Governor that the completed petition has been officially filed. Section 13-27-308, MCA. That occurred in the present case on July 19, 2010.
5. An opponent then has ten days in which to file a challenge to the ballot statements or the legal sufficiency of the petitions. Section 13-27-316(2), MCA. This Court must give the case “precedence” and render a decision “as soon as possible.” Section 13-27-316(3)(c)(i), MCA.
¶34 If we determine that the petitions are not legally sufficient, then the proponent may start over using legally sufficient petitions. Section 13-27-316(3)(c)(iii), MCA. Of course, the proponent remains subject to the deadline on submitting the petitions. But it is not necessarily “impossible” to comply with the foregoing timetable. To be sure, it may be “impossible” to resubmit the ballot issue if the proponents did not commence the initiative process soon enough or if they delayed in submitting the signed petitions to the county election officials. Under those circumstances, there may not be sufficient time to recirculate new petitions if the signed ones are determined to be void. But that is the reality of election deadlines, and it is the risk of which the proponents are on notice when they start the process late. If time runs out, the fault can hardly be placed on the courts. More to the point, it is not justification for this Court to flout unambiguous statutory directives in a proactive effort to rescue the proponents from their own lack of diligence or inability to obtain signatures and submit petitions in a timely manner.
¶35 Nevertheless, this Court has determined to save 1-164 from the doom to which it unquestionably is destined under the statutory scheme. To that end, the Court employs a “cafeteria-style” approach to statutory application, picking and choosing only that statutory language which serves to achieve its goal and rejecting or simply ignoring those provisions which get in the way. I cannot agree with this brand of decision-making. Absent our overruling the statutes based on constitutional authority, we are required to apply them as written. See § 1-2-101, MCA. Doing so here, I would hold as follows:
1. If this Court has jurisdiction over the present ballot challenges, that jurisdiction is set forth in § 3-2-202, MCA, and the parties were required to make the certification or stipulation mandated by § 3-2-202(3)(b)(i), MCA.
2. On the merits of MCFA’s challenge, the ballot statements contained on the circulated and signed petitions are void.
3. This Court has no authority to place statements on the *252 November ballots that are different from the statements on the circulated petitions.
I address these points in turn below.
II. Jurisdiction
A. Article VII, Section 2
¶36 Jurisdiction is the power and authority of a court to hear and decide the case or matter before it. State v. Martz, 2008 MT 382, ¶ 21, 347 Mont. 47, 196 P.3d 1239. This power and authority is conferred on courts only by the Constitution or statutes adopted pursuant to the Constitution. Martz, ¶ 21.
¶37 Because jurisdiction involves the fundamental power and authority of a court to determine and hear an issue, a court may address the question of its jurisdiction sua sponte. See Stanley v. Lemire, 2006 MT 304, ¶¶ 30-32, 334 Mont. 489, 148 P.3d 643. In fact, courts have an “independent obligation” to determine whether jurisdiction exists, even in the absence of a challenge from any party, and a court which in fact lacks jurisdiction cannot acquire it by consent of the parties. Stanley, ¶¶ 31-32.
¶38 Article VII, Section 2 of the Montana Constitution delineates the parameters of this Court’s jurisdiction. It states as follows:
(1) The supreme court has appellate jurisdiction and may issue, hear, and determine writs appropriate thereto. It has original jurisdiction to issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law.
(2) It has general supervisory control over all other courts.
(3) It may make rules governing appellate procedure, practice and procedure for all other courts, admission to the bar and the conduct of its members. Rules of procedure shall be subject to disapproval by the legislature in either of the two sessions following promulgation.
(4) Supreme court process shall extend to all parts of the state.
¶39 Nowhere in Article VII, Section 2, is there authority for this Court to entertain an original proceeding concerning a ballot challenge. Our original jurisdiction is limited. We have original jurisdiction “to issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law.” The present proceeding does not involve a writ. Hence, there being no constitutional source for this Court to exercise original jurisdiction over a non-writ proceeding, the statutes granting us such jurisdiction are, necessarily, null and void. Stanley, ¶ 52 (“Jurisdiction is conferred on the courts only by the Constitution or statutes adopted pursuant to the Constitution.” (emphasis added)).
*253 We must dismiss these cases sua sponte.
B. Section 3-2-202(3), MtCA
i. The Law
¶40 The Court nevertheless proceeds on the premise that it has jurisdiction.over this proceeding. The statutes governing this Court’s jurisdiction are set out in Title 3, chapter 2, part 2, MCA (which is titled “Supreme Court Jurisdiction”). The jurisdictional provisions specific to review of ballot statements are contained in § 3-2-202(3), MCA, which provides as follows:
(a) The supreme court has original jurisdiction to review the petitioner’s ballot statements for initiated measures and the attorney general’s ballot statements for referred measures and the attorney general’s legal sufficiency determination in an action brought pursuant to 13-27-316.
(b) (i) In an original proceeding under subsection (3)(a), the petitioner and the attorney general shall certify the absence of factual issues or shall stipulate to and file any factual record necessary to the supreme court’s consideration of the petitioner’s ballot statements or the attorney general’s legal sufficiency determination.
(ii) If the parties to an original proceeding under subsection (3)(a) fail to make the certification or stipulation required by subsection (3)(b)(i), the supreme court shall refer the proceeding to the district court in the county of residence of the lead petitioner for development of a factual record and an order that addresses the issues provided in 13-27-316(3)....
¶41 Beginning with subsection (3)(a), this Court “has original jurisdiction to review [1] the petitioner’s ballot statements for initiated measures and [2] the attorney general’s ballot statements for referred measures and [3] the attorney general’s legal sufficiency determination in an action brought pursuant to 13-27-316.” This case falls into the third category: a challenge to “the attorney general’s legal sufficiency determination in an action brought pursuant to 13-27-316.” MCFA’s and Harrington’s petitions state that they are brought under § 13-27-316, MCA, and the petitions specifically challenge the Attorney General’s legal sufficiency determination for 1-164.
¶42 Next, there is no dispute that the parties have failed to make the certification or stipulation required by subsection (3)(b)(i)-i.e., they have not certified the absence of factual issues or stipulated to and filed any factual record. The Attorney General asserts that the development of a factual record in district court would be “minimal,” *254 and the Court opines that “no issues of fact exist to preclude this Court from” rendering a decision. But that is beside the point. The statute states that the petitioner and the Attorney General “shall certify the absence of factual issues or shall stipulate to and file any factual record necessary to the supreme court’s consideration of... the attorney general’s legal sufficiency determination.” Section 3-2-202(3)(b)(i), MCA. The statute does not say that the certification or stipulation need be filed only if the Attorney General believes the development of a factual record in district court would be more than “minimal” or if this Court happens to perceive some factual issues. Rather, it says that the certification or stipulation “shall” be filed. Period.
¶43 Lastly, when the parties fail to abide by this requirement, as is the case here, this Court’s only course of action is statutorily mandated:
If the parties to an original proceeding under subsection (3)(a) fail to make the certification or stipulation required by subsection (3)(b)(i), the supreme court shall refer the proceeding to the district court in the county of residence of the lead petitioner for development of a factual record and an order that addresses the issues provided in 13-27-316(3).
Section 3-2-202(3)(b)(ii), MCA (emphasis added). Honoring this unambiguous statutory mandate, we are required to refer this proceeding to a district court for the purposes stated in § 3-2-303(3)(b)(ii), MCA.
ii. The Court’s Workaround
¶44 As a practical matter, if this proceeding were referred to a district court, there would not be time to resolve MCFA’s and Harrington’s challenges before the Secretary of State’s August 19,2010 deadline for certifying the candidates and ballot issues for the November 2 ballot. See § 13-12-201(1), MCA. To get around this problem, the Court declares that § 3-2-202, MCA, does not apply to these cases.
¶45 The first obvious problem with this approach is that if § 3-2-202, MCA, does not apply to these cases, then we do not have jurisdiction. As noted, § 3-2-202(3), MCA, is the statute which purports to confer “original jurisdiction” on this Court to review ballot statements. No other provision does so. The Court asserts that § 13-27-316(5), MCA, “endows” this Court with “original jurisdiction” to hear challenges to ballot statements, but this is pure fantasy. Section 13-27-316(5), MCA, states:
An original proceeding in the supreme court under this section is the exclusive remedy for a challenge to the petitioner’s ballot *255 statements, as approved by the attorney general, or the attorney general’s legal sufficiency determination. A ballot issue may not be invalidated under this section after the secretary of state has certified the ballot under 13-12-201.
It is self-evident that this is not an affirmative “endowment” of jurisdiction. Rather, it is a reference to the “original proceeding” which is established by the grant of “original jurisdiction” in § 3-2-202(3), MCA.
¶46 The second problem with the Court’s approach is that it involves a blatant remaking of Harrington’s and MCFA’s challenges. Again, this Court “has original jurisdiction to review [1] the petitioner’s ballot statements for initiated measures and [2] the attorney general’s ballot statements for referred measures and [3] the attorney general’s legal sufficiency determination in an action brought pursuant to 13-27-316.” Section 3-2-202(3)(a), MCA. Focusing on the third category, the question becomes whether Harrington and MCFA challenge the Attorney General’s “legal sufficiency” determination and whether their action is brought pursuant to § 13-27-316, MCA. Section 13-27-316(2), MCA, states:
If the opponents of a ballot issue believe that the petitioner ballot statements approved by the attorney general do not satisfy the requirements of 13-27-312 or believe that the attorney general was incorrect in determining that the petition was legally sufficient, they may, within 10 days of the date of certification to the governor that the completed petition has been officially filed, file an original proceeding in the supreme court challenging the adequacy of the statement or the attorney general’s determination and requesting the court to alter the statement or overrule the attorney general’s determination concerning the legal sufficiency of the petition. . . .
¶47 The Court concedes that Harrington and MCFA “challenge the ballot statements and Attorney General’s legal sufficiency determination for 1-164 under § 13-27-316, MCA.” In this regard, “legal sufficiency’ is defined as follows:
As used in this part, “legal sufficiency” means that the petition complies with statutory and constitutional requirements governing submission of the proposed issue to the electors. Review of the petition for legal sufficiency does not include consideration of the substantive legality of the issue if approved by the voters.
Section 13-27-312(7), MCA (emphasis added). One of the so-called “statutory... requirements governing submission of the proposed issue *256 to the electors” is set forth in subsection (4) of the same statute: “The ballot statements must express the true and impartial explanation of the proposed ballot issue in plain, easily understood language and may not be arguments or written so as to create prejudice for or against the issue.” Section 13-27-312(4), MCA. The Attorney General is specifically instructed to ensure that this “statutory requirement” is met. See § 13-27-312(1), MCA (“[T]he attorney general ... shall determine whether the ballot statements comply with the requirements of this section.”). Here, Harrington and MCFA challenge the Attorney General’s determination that I-164’s statement of purpose, fiscal statement, and statements of implication are legally sufficient under § 13-27-312(4), MCA. Thus, Harrington and MCFA do, in fact, challenge the Attorney General’s determination that the petition complies with the “requirements governing submission of the proposed issue to the electors.”
¶48 According to the Court, however, Harrington and MCFA raise an improper challenge to the “substantive legality” of 1-164, rather than to the Attorney General’s determination of legal sufficiency. This is an outright fabrication. Indeed, the Court cannot point to a single sentence in MCFA’s petition or Harrington’s petition challenging the “substantive legality” of 1-164. They do not contend that 1-164, if approved by the voters, would constitute a taking of property without just compensation. They do not contend that 1-164, if approved by the voters, would violate the Equal Protection Clause. They do not contend that 1-164, if approved by the voters, would deprive lenders of property without due process of law. They do not contend that 1-164, if approved by the voters, would constitute unconstitutional special legislation. In short, neither MCFA nor Harrington lodges any challenge whatsoever to “the substantive legality of [1-164] if approved by the voters.” Section 13-27-312(7), MCA.
¶49 Rather, their petitions clearly and unmistakably challenge the Attorney General’s determination that the ballot statements comply with the statutory requirements governing submission of 1-164 to the electors. The first sentence of MCFA’s Summary of Argument states:
MCFA contends that I-164’s ballot statements do not meet the requirements of section 13-27-312, MCA. As a result, the statements do not meet the statutory requirements for submitting the proposed issue to the electors.
And the first sentence of MCFA’s analysis beginning on page 6 of its petition states:
MCFA initiated this original proceeding pursuant to section *257 13-27-316, MCA, for the purpose of challenging the adequacy of I-164’s ballot statements.
MCFA then goes on, over four pages, to explain why, in its view, the ballot statements do not satisfy § 13-27-312(4), MCA. Finally, at the conclusion of its argument, MCFA asks this Court to
find that 1-164 ballot statements do not meet the requirements of section 13-27-312, MCA, and consequently do not meet the statutory requirements for submitting the proposed issue to the electors, and overrule any determination that the ballot issue is legally sufficient.
Harrington’s petition is to the same effect. He states:
This is an action for judgment arising from the manner in which the Office of the Attorney General of the State of Montana, erroneously prepared and approved statements and made a legal sufficiency determination for a ballot initiative, 1-164 ....
Harrington further asserts that the statement of purpose, fiscal statement, and statements of implication approved by the Attorney General do not meet the requirements of § 13-27-312(4), MCA-i.e., they do not “express the true and impartial explanation of the proposed ballot issue in plain, easily understood language,” and they are “written so as to create prejudice for... the issue.” Harrington then goes on to propose alternate ballot statements, something he would not have to bother with if he were truly raising a challenge to the “substantive legality” of the measure as the Court claims. See § 13-27~316(3)(b), MCA (“If the proceeding requests modification of ballot statements, an action brought under this section must state how the petitioner’s ballot statements approved by the attorney general do not satisfy the requirements of 13-27-312 and must propose alternate ballot statements that satisfy the requirements of 13-27-312.” (emphasis added)).
¶50 Even the Court concedes elsewhere in its Order that MCFA and Harrington “invoke this Court’s original jurisdiction to challenge the Attorney General’s legal sufficiency determination and ballot statements for Initiative No. 164” and that MCFA and Harrington “challenge the ballot statements and Attorney General’s legal sufficiency determination for 1-164 under § 13-27-316, MCA.” Indeed, if their challenges were to the substantive legality of 1-164, and not to the Attorney General’s determination under § 13-27-312(7), MCA, that “the petition complies with statutory and constitutional requirements governing submission of the proposed issue to the electors,” then there would be no need to rewrite the ballot statements, as the Court does. *258 ¶51 Accordingly, these cases fall squarely within the third category of § 3-2-202(3)(a), MCA. Yet, the parties have failed to make the certification or stipulation required by § 3-2-202(3)(b)(i), MCA. Consequently, this Court is required to refer this proceeding to a district court. The Court’s refusal to do so only demonstrates that it is willing to ignore statutory mandates and to distort Petitioners’ arguments in order to reach a desired result.
III. The Merits of MCFA’s Challenge
¶52 I agree with the Court’s implicit conclusion that the statement of purpose and statements of implication adopted by the Attorney General do not “express the true and impartial explanation of the proposed ballot issue in plain, easily understood language.” Section 13-27-312(4), MCA. I reach this conclusion for the reasons argued by MCFA, which I explain below.
¶53 Initially, however, I note the Attorney General’s threshold argument that MCFA’s petition is deficient because MCFA has not proposed alternate ballot statements. This argument is totally without merit. For one thing, alternate ballot statements are required only if the challenger “requests modification of ballot statements” in the action before this Court. Section 13-27-316(3)(b), MCA. And here, MCFA does not request modification of the ballot statements. Rather, MCFA seeks to invalidate the 1-164 petitions and 1-164 itself on the ground that the ballot statements contained on the petitions were deficient. Thus, MCFA was not required to propose alternate statements.
¶54 Furthermore, if the language of the 1-164 petitions is in fact invalid, no proposed alternate language could save them now. The petitions have already been circulated and signed. Those who signed the petitions have already read the deficient statement of purpose and deficient statements of implication. It is too late to recirculate the petitions. See §§ 13-12-201(1), 13-27-104, MCA. The Attorney General fails to explain what possible purpose could be served at this point by proposing alternate language. And there is no statutory requirement that an opponent do so under the present circumstances.
¶55 Turning then to the merits of the issue, the fundamental problem with the language of the petitions is quite apparent; and it is perplexing, therefore, that the Attorney General did not recognize and remedy this problem, prior to the petitions’ being circulated, in his review of the proposed language and his consultation with parties on both sides of the issue. See § 13-27-312(1), (2), MCA. 1-164 changes the law with respect to five categories of lenders/businesses. Specifically, *259 the initiative applies to:
1. So-called “retail installment lenders” (the term used in I-164’s statement of purpose). Such entities are regulated under Title 31, chapter 1, part 2, MCA (the Montana Retail Installment Sales Act). They include “a person who sells goods or furnishes services to a retail buyer in a written retail installment contract or written retail installment transaction.” Section 31-l-202(l)(p), MCA. Sections 3 and 4 of 1-164 amend §§ 31-1-203 and -241, MCA, respectively, to limit the permissible finance charge retail installment lenders may charge to 36% per annum.
2. Pawnbrokers, who are regulated under Title 31, chapter 1, part 4, MCA. Section 5 of 1-164 amends § 31-1-401, MCA, to prohibit pawnbrokers from engaging in certain financial activities (such as cashing or advancing money for a postdated or deferred presentment check in exchange for a fee or finance charge), unless the pawnbroker is licensed as a consumer loan licensee, deferred deposit loan licensee, or title loan licensee. Thus, if 1-164 passed, pawnbrokers would be subject to the same 36% interest rate cap to which these other entities are subject.
3. Deferred deposit (payday) lenders, who are regulated under Title 31, chapter 1, part 7, MCA (the Montana Deferred Deposit Loan Act). Sections 2 and 6 of 1-164 amend §§ 31-1-112 and -722, MCA, respectively, to limit the permissible finance charge deferred deposit lenders may charge to 36% per annum.
4. Title lenders, who are regulated under Title 31, chapter 1, part 8, MCA (the Montana Title Loan Act). Sections 2 and 7 of I-164 amend §§ 31-1-112 and -817, MCA, respectively, to limit the permissible finance charge title lenders may charge to 36% per annum.
5. Consumer loan licensees, who are regulated under Title 32, chapter 5, MCA (the Montana Consumer Loan Act). Such entities are licensed to offer or extend credit to an individual primarily for personal, family, or household purposes. See § 32-5-102(2)(a), MCA. They do not include deferred deposit lenders, title lenders, and certain other regulated lenders such as banks and credit unions. See §§ 32-5-102(2)(b), -103(5), MCA. Sections 2 and 8 of 1-164 amend §§ 31-1-112 and 32-5-301, MCA, respectively, to limit the permissible finance charge consumer loan licensees may charge to 36% per annum.
¶56 Two of these affected entities are not disclosed to voters in the statement of purpose and the statements of implication adopted by the *260 Attorney General and presented on the face of the petitions (one of which is included as an exhibit at the end of this Dissent). The Attorney General’s statement of purpose, fiscal note, and statements of implication inform voters that 1-164 does the following (with emphases added):
Under Montana law, deferred deposit (payday) lenders may charge fees equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 31-day loan or 650 percent for a 14-day loan. Title lenders may charge interest equaling one-fourth of the loan, which is the same as an annual interest rate of 300 percent for a 30-day loan. 1-164 reduces the interest, fees, and charges that payday, title, and retail installment lenders may charge to an annual interest rate of 36 percent. It prohibits businesses from structuring other transactions to avoid the rate limit.
1-164 reduces the license and examination fee revenue paid to the State because certain lenders may not renew their licenses.
[ ] FOR reducing the annual interest, fees, and charges payday, title, and retail installment lenders may charge on loans to 36 percent.
[ ] AGAINST reducing the annual interest, fees, and charges payday, title, and retail installment lenders may charge on loans to 36 percent.
Deferred deposit (payday) lenders, title lenders, and retail installment lenders are identified. But, as MCFA correctly points out, the statement of purpose and the statements of implication make no mention whatsoever of consumer loan licensees or pawnbrokers, even though these entities are covered and affected by the initiative. Voters are not told that 1-164 reduces the interest, fees, and charges that consumer loan licensees may charge to an annual interest rate of 36 percent. In this regard, it must be recalled that the statutory scheme clearly distinguishes consumer loans from deferred deposit loans, title loans, and retail installment transactions. See §§ 31-l-202(l)(m)-(o), 32-5-102(2), MCA.
¶57 The Attorney General is required by law to review a proposed ballot issue for legal sufficiency-i.e., whether the petition “complies with statutory and constitutional requirements governing submission of the proposed issue to the electors.” Section 13-27-312(1), (7), MCA. Among other statutory requirements, perhaps the most basic is that the statement of purpose and the statements of implication “must express the true and impartial explanation of the proposed ballot issue *261 in plain, easily understood language.” Section 13-27-312(4), MCA. Although the summary preceding an initiative need not contain a complete catalog or index of all provisions -within the initiative, the statement of purpose must “provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot.” Citizens Right to Recall v. McGrath, 2006 MT 192, ¶ 16, 333 Mont. 153, 142 P.3d 764 (internal quotation marks omitted).
¶58 Here, MCFA contends, and I agree, that the statement of purpose adopted by the Attorney General “not only fails to specifically mention Montana consumer loan licensees, but does not even provide a clue that this licensee is a subject of the initiative.” The statement of purpose identifies “payday, title, and retail installment lenders” only. It does not identify any other type of lender, and there is no language that could reasonably be understood to include consumer loan licensees and pawnbrokers within I-164’s scope.
¶59 Consequently, the statement of purpose and the statements of implication on the face of the 1-164 petitions submitted to voters for signatures are deficient and invalid. They do not “express the true and impartial explanation of the proposed ballot issue in plain, easily understood language.” Section 13-27-312(4), MCA. Nor do they provide fair notice of the content of the proposed initiative, so that the voter will not be misled as to its purpose and can make an intelligent decision of whether to sign the petition. Citizens Right to Recall, ¶ 16. They are, in fact, misleading in their suggestion that 1-164 applies only to “payday, title, and retail installment lenders,” when it actually applies to pawnbrokers and consumer loan licensees as well. Cf. Sawyer Stores v. Mitchell, 103 Mont. 148, 163-64, 62 P.2d 342, 349-50 (1936).
¶60 The Attorney General argues, first, that there is a “scarce” 100-word limit on a statement of purpose, see § 13-27-312(2)(a), as if to suggest that some of the parties who will be affected by a proposed ballot initiative may be omitted or ignored in order to satisfy this word limit. This contention is not even remotely persuasive. A statement of purpose is supposed to be a “true” explanation of the proposed ballot issue. Section 13-27-312(4), MCA. When the Attorney General provides a discrete list of three specific entities to which 1-164 specifically applies (“payday, title, and retail installment lenders”), the logical inference is that these entities are the only entities covered by the initiative. A person of average intelligence and common sense is not going to assume that there may be some unknown quantity of other *262 entities which are covered by the initiative but which the Attorney General did not bother to mention. The notion that a statement of purpose is “true” when it purports to list the parties affected by the initiative, but actually omits two of those affected parties, is utterly implausible, and the Court properly rejects it.
¶61 The Attorney General next argues that the statement of purpose “indicate[s] that other ‘businesses’ are subject to the initiative as well” because the term “businesses” is used in the last sentence of the statement of purpose, which states: “[1-164] prohibits businesses from structuring other transactions to avoid the rate limit.” This contention is truly bizarre for two reasons. First, it is not clear what the term “businesses” even means here. Is it a reference to the “businesses” mentioned in the preceding sentence (“payday, title, and retail installment lenders”)? Or is it a reference to all “businesses”? If the latter, then the term “businesses” is misleading because 1-164 does not actually impose the 36 percent rate limit on all businesses. To the contrary, there are various businesses which, like consumer loan licensees, deferred deposit loan licensees, and title loan licensees, are considered “regulated lenders,” but which are not covered by 1-164. These include banks, building and loan associations, savings and loan associations, trust companies, credit unions, credit associations, residential mortgage lender licensees, development corporations, bank holding companies, and mutual or stock insurance companies. Section 31-1-111(1), MCA. These “businesses” are exempt from all limitations on the rate of interest that they may charge and are also exempt from the operation and effect of all usury statutes. See § 31-1-112(1), MCA. While Ben Bernanke might have an idea of what the term “businesses” means in the last sentence of the Attorney General’s statement of purpose, the average voter presented with an 1-164 petition certainly would not.
¶62 Second, the Attorney General concedes that one of the reasons he rewrote the proponents’ statement of purpose in the first place was because the statement “did not specify the type of loans subject to the limits.” The proponents’ statement of purpose read (with emphasis added):
Initiative [164] limits the annual interest, fees and charges certain lenders, including payday and car title lenders, may charge on loans to 36 percent because some lenders charge annual rates of more than 400 percent. It extends to all Montanans the same interest rate limit provided to military personnel and their families. It imposes restrictions to prevent lenders from avoiding *263 the rate limits. Loans in violation of the 36 percent annual rate violate the Montana Unfair Trade Practices and Consumer Protection Act.
Yet, the word “businesses” selected by the Attorney General likewise does not specify the type of loans subject to the limits. It is no more informative than the word “certain lenders” selected by the proponents. In fact, it is less informative because “certain lenders” is obviously narrower than “businesses.” The proponents’ proposed statement of purpose at least had the virtue of letting voters know that there were other lenders besides “payday and car title lenders” that were affected by 1-164. The Attorney General’s statement of purpose, on the other hand, refers to “payday, title, and retail installment lenders” and in no way indicates that there are two other regulated lenders that are affected by the initiative.
¶63 Next, the Attorney General argues, in conclusory fashion, that voters would not understand, or might misconstrue, what “consumer loan licensees” are. First of all, however, this is not a valid justification for omitting these entities from the statement of purpose. Consumer loan licensees are one of five specific entities targeted by the initiative, and they therefore should be mentioned in the statement of purpose along with the three targeted entities that are mentioned. Moreover, while the Attorney General criticizes Harrington for not presenting any evidence in support of his arguments, the Attorney General himself presents no evidence that voters would be confused by the term “providers of consumer loans” or that voters understand this term any less than they understand the terms “retail installment lenders,” “deferred deposit (payday) lenders,” and “title lenders.” The Attorney General’s argument, rather, is based entirely on sheer conjecture.[3] Finally, and even more to the point, to the extent that voters actually would be confused by the statement of purpose and the statements of implication as written, it is the Attorney General’s statutory obligation to reject those statements outright, §§ 13-27-202(4), -312(1), MCA, and to rewrite the language so that voters will not be confused, § 13-27-312(8)(b), MCA. Simply leaving voters in the dark is not a lawful option.
*264 ¶64 It is ironic that in rejecting Harrington’s assertion that the statement of purpose should name the types of regulated lenders that are excluded from I-164’s application, the Attorney General suggests that what voters actually “care about” are the entities that are affected by 1-164, not the ones that are not affected by the initiative. Yet, two affected entities (pawnbrokers and consumer loan licensees) are not even mentioned.
¶65 As a final matter, although not explicitly cited by MCFA, it is important to acknowledge another facet of 1-164 that is not mentioned in the Attorney General’s statement of purpose. Again, § 13-27-312(4), MCA, read together with Citizens Right to Recall, ¶ 16, requires that the statement of purpose and the statements of implication be written so as not to mislead voters as to the initiative’s purpose. They must be written with the goal of “fair notice”-i.e., to truthfully inform, so that voters can make an intelligent decision. Unfortunately, as with 1-143, it appears that 1-164 is yet another “carefully crafted” initiative to put out of business certain lawfully operating businesses which are licensed and regulated by the State. See Kafka v. Montana Dept. of FWP, 2008 MT 460, ¶¶ 114-116, 348 Mont. 80, 201 P.3d 8 (Nelson, Rice, & Swandal, JJ., dissenting). With 1-143, it was alternative livestock ranchers (game farmers). With 1-164, it is certain types of regulated lenders (payday and title lenders in particular). Through the simple expedient of statutorily reducing the price for which the businessperson can sell his or her product or service-here the interest rate such lenders may charge-the public can, without paying just compensation for the taking (see Kafka, ¶¶ 54, 64, 83, 94 (Opinion of the Court)), simply render a business unprofitable.[4]
¶66 For the foregoing reasons, the language of the 1-164 petitions is invalid. Because we cannot go back and “fix” that language, see § 13-27-316(3)(c)(ii), MCA, as the petitions have already been *265 presented to and signed by registered voters, the legally correct course of action is to grant MCFA’s requested remedy of declaring the petitions void and ordering that 1-164 may not appear on the ballot, see § 13-27-316(3)(c)(iii), MCA.
IV. The Court’s New Ballot Statements
¶67 As noted at the outset, this Court has no authority to place statements on the November ballots that are different from the statements on the circulated petitions. Granted, this Court has been given authority to rewrite the ballot statements.[5] See § 13-27-316(3)(c)(ii), MCA (“If the court decides that the ballot statements do not meet the requirements of 13-27-312, it may . . . certify to the secretary of state a statement that the court determines will meet the requirements of 13-27-312.”). But “[a] statement . . . certified by the court must be placed on the petition for circulation and on the official ballot.” Section 13-27-316(3)(c)(ii), MCA (emphasis added). Moreover, “[i]f... the supreme court revises the petition form or ballot statements, any petitions signed prior to the revision are void.” Section 13-27-316(4), MCA.
¶68 Even as a purely intuitive matter, it seems patently obvious that the statement of purpose, fiscal statement, and statements of implication contained on the petitions circulated to voters must be the same (at least in substance) as the statement of purpose, fiscal statement, and statements of implication on the ballot provided at the election. Circulating petitions that say one thing and then providing election ballots that say something else undermines the initiative process and misleads the voters. Indeed, it is bait-and-switch fraud and akin to obtaining illegal petition signatures. See § 13-27-317, MCA (requiring the ballot issue to be decertified under such circumstances). This is why when this Court revises the petition form or ballot statements, “any petitions signed prior to the revision are void.” Section 13-27-316(4), MCA. And without valid petitions, the ballot issue may not appear on the ballot. See §§ 13-27-307, -308, MCA; see also e.g. § 13-27-316(3)(c)(iii), MCA.
¶69 That this Court would so blatantly disregard the law so that a ballot measure can appear on the ballot, notwithstanding the fact that *266 the petitions upon which the measure is premised are void, should be of grave concern to the very people the Court purports to be protecting: the voters. In this connection, there is an undercurrent in the Attorney General’s arguments and in the Court’s decision in these cases that invalidating 1-164 would disenfranchise voters. This proposition is utterly unavailing. Those who signed the petitions were not properly advised of I-164’s purpose and the implications of a vote for or against the initiative. At this point in time, no one has “voted” on 1-164, and no one is being “disenfranchised”-i.e., deprived of the right to vote. See Black’s Law Dictionary 480 (Bryan A. Garner ed., 7th ed., West 1999). Indeed, if this sort of argument had any merit, we could never declare an initiative invalid, for to do so would “disenfranchise” voters. That, of course, is nonsense, since we do, on occasion, declare initiatives which violate the law or the constitution invalid, both before and after voters have voted. See e.g. State ex rel. Montana Citizens v. Waltermire, 227 Mont. 85, 738 P.2d 1255 (1987); Marshall v. State ex rel. Cooney, 1999 MT 33, 293 Mont. 274, 975 P.2d 325; Montanans For Justice v. State ex rel. McGrath, 2006 MT 277, 334 Mont. 237, 146 P.3d 759; Citizens Against CI-97 v. State, 2006 MT 278, 334 Mont. 265, 147 P.3d 174. The lesson from these cases, and others like them, is that no one has the right to vote on a ballot measure that is placed before them in violation of the law or the Constitution. Unfortunately, this is a lesson lost upon the Court here.
V. Conclusion
¶70 The people of this State, through their elected representatives, adopted a system designed to ensure that ballot measures would not appear on the ballot unless certain prerequisites were satisfied. To be sure, the statutory “scheme”-which is, perhaps, an apt appellation-is far from perfect. In this regard, the Attorney General explains that the Legislature revised the initiative process in 2007 in order to avoid a repeat of the “electoral confusion” and “crisis of direct democracy’ that surrounded three ballot issues in 2006. See generally Laws of Montana, 2007, ch. 481; Stop Over Spending Montana v. State, 2006 MT 178, 333 Mont. 42, 139 P.3d 788; Montanans For Justice v. State ex rel. McGrath, 2006 MT 277, 334 Mont. 237, 146 P.3d 759. Unfortunately, however, as the present challenges to 1-164 demonstrate, problems still remain-not the least of which is the fact that challenges to petitions are brought after the petitions have been circulated and signed, not to mention the fact that this Court has been granted “original jurisdiction” which the Montana Constitution does not authorize. Moreover, we are once again faced with a challenge to a ballot *267 initiative on an extremely tight timeline, and the parties have failed to comply with the most basic requirements adopted by the Legislature: certify the absence of factual issues, or stipulate to and file any factual record necessary to our decision. To the extent these circumstances have created another “crisis,” blame for it plainly lies with lawmakers and the patent failure of the parties to comply with the statutes.
¶71 The entire scheme should probably be scrapped, and the Legislature should simply start over from scratch with a clear statutory framework that (a) is practical and can be understood; (b) allows sufficient time for review by the designated state officials, revisions to the extent necessary, and review of the inevitable ballot challenges by this Court; and (c) guarantees transparency and truth in the initiative and ballot process. In the meantime, however, it is not this Court’s prerogative to take on the role of pseudo-legislators and manipulate clear statutory mandates in order to achieve some presumed greater good. It is the Legislature’s constitutional role to enact the statutes, and it is this Court’s constitutional role to apply them in a forthright manner. The only “crisis of direct democracy” in the present case is this Court’s inability to simply follow the law.
¶72 I am no more a fan of lending institutions that gouge consumers, especially those with lower incomes, than I am of people who charge for the “sport” of shooting defenseless penned animals-indeed, the two compare favorably. However, both the blackletter law and our caselaw require that voters be truthfully informed; that the purposes driving a citizens’ initiative, as well as the implications of the initiative, be transparent; and that voters not be misled into voting for the wolf of a facially well-intentioned initiative cloaked in the sheep’s clothing of misleading statements of purpose and implication.
¶73 As for the goals of I-164’s proponents, since there is, apparently, such a public hullabaloo over the interest rates that payday lenders and title lenders charge, the public should simply demand that its representatives in the Legislature step up to the plate in the next session, do the job which that body has always had the power to do, and actually regulate the interest rates of payday, title, and other “regulated” lenders in the interests of consumers. The demise of 1-164 certainly would not prevent the Legislature from accomplishing this objective itself.
¶74 Lastly, as to the Concurrence, while it is always easier to shoot the messenger, this Dissent’s analysis stands unrefuted.
¶75 I would hold that this Court does not have jurisdiction to *268 entertain Harrington’s and MCFA’s petitions challenging the 1-164 ballot statements. Furthermore, even if we did have jurisdiction under § 3-2-202(3)(a), MCA, we would be required to refer this proceeding to a district court pursuant to § 3-2-202(3)(b)(ii), MCA. Alternatively, on the merits of MCFA’s challenge, I conclude that the Attorney General’s legal sufficiency determination is incorrect and that 1-164 does not comply with statutory requirements. As a result, the petitions are void, and 1-164 may not appear on the ballot. See § 13-27-316(3)(c)(iii), MCA. Finally, the Court’s decision to rewrite the statements for the November ballot, despite the fact that the underlying petitions are void, is without authority and legally untenable.
¶76 I dissent.

 State ex rel. Montana Citizens v. Waltermire, 227 Mont. 85, 93, 738 P.2d 1255, 1260 (1987) (quoting State ex rel. Woods v. Tooker, 15 Mont. 8, 13, 37 P. 840, 842 (1894)).

 Here, the 1-164 proponents first submitted the proposed ballot issue and draft ballot statements to the Secretary of State on February 23, 2010. The Legislative Services Division completed its review on March 5, the Attorney General completed his review on April 22, and the Secretary of State authorized the proponents to commence signature gathering on April 23.

 Not only that, the Attorney General’s arguments are internally inconsistent. In one paragraph, the Attorney General states that he left consumer loan licensees out of the statement of purpose because “the application of a 36% annual interest rate to consumer loans is more straightforward.” Yet, in the very next paragraph, the Attorney General asserts that “consumer lender” is “a technical term” that voters might misconstrue.

 It is unlikely, also, that most voters appreciate that payday and title lenders exist, if at all, because most people with lower incomes-whose only “asset” is their car or minimum-wage paycheck-have no legitimate source of reasonably priced, short-term credit when there are more bills than money at the end of the month or when presented with an unexpected financial emergency. They borrow at exorbitant rates of interest because there is no other alternative. I doubt, too, that most voters understand that other “regulated lenders,” including banks, building and loan associations, savings and loan associations, trust companies, credit unions, credit associations, residential mortgage lender licensees, development corporations, bank holding compames, and mutual or stock insurance companies (see § 31-1-111(1), MCA)-some of the same folks that lapped up billions in taxpayer-funded bailouts and bonuses-are exempt from all limitations on the rate of interest that they may charge and are exempt from the operation and effect of all usury statutes (see § 31-1-112(1), MCA).

 As an aside, I find it untenable that this Court possesses such authority. This Court is, or at least should be, in the business of judging conflicts and disputes over language. It should not be in the business of rewriting disputed language so that the favored party-here, the Attorney General-wins the dispute. That the statute even permits such a perverse result violates the most fundamental principles of fairness and impartiality that presumably govern all courts and judges.